## DAVID A. GAGE

### *v.*

## FRANKLIN PARMELEE.

1. SETTLEMENT—*not opened for slight cause.* A settlement of partnership accounts, and the sale by one partner to the other of his interest, fairly and deliberately made, and evidenced by their written agreement, signed and sealed, will not be set aside for slight or trivial reasons.

2. FRAUD—*grounds for setting aside contract.* The rule in equity is, that when a party is not a free agent, and is not equal to protecting himself, and advantage is taken of him, the court will protect him. Circumstances of extreme necessity and distress of the party, although not accompanied by any direct restraint or duress, may in like manner so entirely overcome his free agency as to justify a court in setting aside a contract made by him, on account of some oppression or fraudulent advantage, or imposition attendant upon it.

3. ACCOUNT STATED—*when opened in equity.* The statement of an account between partners will be conclusive upon their rights, unless it is shown there has been some mistake or omission, or accident or fraud, or undue advantage, by which the same is vitiated and the balance incorrectly fixed. In such case a court of equity will allow it to be opened and re-examined.

4. Although a partner, at and before the time of making a settlement of the partnership account, and selling his interest to his co-partner, may have been under great financial embarrassment and under indictment as an officer for embezzlement, yet, if he is a free agent, and has ample time to deliberate, and procures a competent accountant to examine the books of the firm, who makes a faithful examination, and submits the same, and the party objects as to certain matters, showing that he understands the business, and the proof also shows that he was familiar with it, and he finally makes a lumping trade settling the business and disposing of his interest, and, some time after, ratified the act by asking time to pay a balance, a court of equity will not set aside the transaction, even though the co-partner pressed him for a dissolution and settlement.

5. PARTNERSHIP—*salary of active partner.* Where the active and managing partner was, by the articles of co-partnership, allowed a salary of $1000 a year for his services, and afterwards one partner sold out his interest and retired, and no new agreement was entered into, and, as the business increased, the active partner charged on the books from time to time an increase in his salary, to which no objection was made by the other partner, although he often examined the books and had monthly statements furnished him, it was *held*, that after dissolution, and settlement on the basis of the increased salary, this was no ground for setting the settlement aside.

6. CHANCERY—*bill to open settlement between partners.* Where a bill, filed to set aside a settlement of a partnership account on various grounds, contained a general charge that the books of account, if properly examined, would show other frauds, *held,* that the latter charge added nothing, and was not entitled to be considered.

7. INTEREST is not payable upon balances as between partners except by some agreement or understanding.

8. EVIDENCE—*presumption from its destruction.* The presumption of law arising from the non-production or destruction of evidence by one party, can not relieve the opposite party from the burden of proving his case. It will justify the admission of secondary evidence, and when the evidence is conflicting, then the presumption will have its full operation and weight.

APPEAL from the Superior Court of Cook county; the Hon. SAMUEL M. MOORE, Judge, presiding.

Messrs. GOUDY, CHANDLER & SKINNER, for the appellant.

Mr. JOHN N. JEWETT, for the appellee

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was a bill in equity, filed in the Superior Court of Cook county, by the appellant, David A. Gage, against the appellee, Franklin Parmelee, to set aside a settlement had between them in 1874, upon the dissolution of the co-partnership between the parties.

In the year 1854, the said Gage, Parmelee, Liberty Bigelow and Martin S. Johnson formed a co-partnership, by the firm name of F. Parmelee & Co., for the purpose of carrying on a stage or omnibus business in the city of Chicago. The articles of co-partnership were in writing, and among other things provided that Parmelee should receive the sum of $1000 per annum for taking the active charge of the business, and that the net profits of the business should be shared equally by the co-partners. In the year 1858 Johnson retired from the firm, and Gage, Parmelee and Bigelow continued the business under the same firm name, without any new articles of co-partnership being executed, until May, 1871, when Bigelow sold out to his

co-partners all his one-third interest in both the real and personal property of the firm for the sum of $30,000, for which he took the unsecured notes of Parmelee & Gage, who continued the business together, without change of firm name, until January 1, 1874, when their relations were dissolved, and Parmelee purchased the interest of Gage in the business and personal property of the firm, assuming all the debts of the firm, except such as were secured upon real estate, and paying to Gage about $18,000, their contract in the matter being embodied in a writing of that date signed and sealed by the parties. It is this which the bill seeks to have set aside.

It appears that in the year 1873, Gage was treasurer of the city of Chicago, and in the autumn of that year became seriously embarrassed in his financial affairs, and on the 16th day of December, 1873, retired from the office of treasurer, and on the 7th day of January, 1874, an indictment was found against him in the Criminal Court of Cook county, by reason of a deficit in his accounts as treasurer, in the sum of about $300,000, upon which he was not tried until the month of December of that year.

The general charge of the bill is, that Parmelee took an unjust advantage of the necessitous and distressing circumstances in which complainant was placed, and demanded imperatively a dissolution of the firm and an immediate settlement between them; that thereupon a hurried and insufficient examination of the books was made by one Parker; that Parmelee presented to Gage a statement of account, showing, as Parmelee represented, that complainant's interest in the concern was about $15,000; and on the hypothesis that such was the true showing, and upon the demand of Parmelee that he should immediately do so, complainant entered into the agreement of dissolution and settlement of January 1, 1874, for the grossly inadequate consideration therein stated, his true interest at the time being of the value of $100,000; that the dissolution and settlement were a fraud upon the complainant, setting forth several particulars of alleged fraud.

The court below upon final hearing dismissed the bill, and the complainant appealed.

It is urged, as a ground of relief, that the mental condition and distress of mind of appellant occasioned by his embarrassments and troubles were such, that with the alleged unjust advantage taken thereof in enforcing and hurrying on the dissolution and settlement, they afford sufficient ground for setting the same aside.

The principle within which it is thus sought to bring the case is laid down as follows, in 1 Story's Eq. Ju., § 239: "And the constant rule in equity is, that where a party is not a free agent, and is not equal to protecting himself, the court will protect him.　*　*　*　Circumstances, also, of extreme necessity and distress of the party, although not accompanied by any direct restraint or duress, may, in like manner, so entirely overcome his free agency as to justify the court in setting aside a contract made by him, on account of some oppression, or fraudulent advantage, or imposition attendant upon it."

We do not consider that the facts of this case at all come within the application of this principle. It in no respect appears, from the circumstances and mental condition of appellant, that he was not a full free agent, equal to protecting himself, or that he stood in the need of the protection of a court.

It is true, that appellee insisted upon a dissolution and a settlement; and justifiably so, we think, under the circumstances—the proof indicating it to be a matter of financial necessity. Nothing of undue advantage appears in hurrying the settlement without full opportunity of investigation and deliberation. The matter of dissolution was broached in December; the settlement was not actually concluded until on the 16th day of March following, the writing of dissolution and settlement being dated back to January 1. Three mutual friends were called in to aid in the settlement. Two of them examined and appraised the property. Parker, an expert accountant, selected by appellant himself, examined the books.

Much time, amounting to weeks, after the matter of the settlement had been substantially referred to the three mutual friends, Loomis, Hall and Richmond, was consumed in talks and examinations.    Notwithstanding the other troublous matters which appellant had to think of and attend to, there would seem to have been ample time here for deliberation, and for making all needful inquiries and examinations in order to come to an intelligent conclusion in respect to the business affairs of the firm ; and if there was any lack in such respects, it must have been the fault of appellant.    The evidence does not show it to be in any manner chargeable to appellee.

If the settlement is to be taken as made upon the basis of a *stated account,* it must be held conclusive, unless the case be brought by the proof within the doctrine as laid down in 1 Story Eq. Jur. § 523 :   " But, if there has been any mistake, or omission, or accident or fraud, or undue advantage, by which the account stated is in truth vitiated, and the balance is incorrectly fixed, a court of equity will not suffer it to be conclusive upon the parties, but will allow it to be opened and re-examined."

The particulars in which the bill attacks the settlement made by the parties, and which are here insisted upon, are as follows :

1.    The complainant claims that he was under a mistake as to the amount of the yearly net profits of the business.

2.    That the interest account, if properly made up, would have shown a large balance due to complainant which was not allowed in the settlement.

3.    That there were entries upon the books of large amounts paid to certain third persons as commissions on omnibus tickets, or certain data and so called vouchers in Parmelee's possession, representing such payment, with a large portion of which complainant was charged, that were never paid, wherein the defendant committed a fraud.

4.    That instead of $1000 per year, as agreed, Parmelee had drawn as a salary a sum largely in excess of that amount,

to-wit: about the sum of $5000 per annum, which fact he fraudulently suppressed

5. That the books of account, if properly examined and settled, would show other frauds committed by Parmelee against the complainant.

The witness Parker, who examined the books, testifies that, from the computation he made from the books, the average yearly profits of the firm for the nineteen and one-fourth years of its continuance, according to his impression, were between $34,000 and $35,000, but that these were not net profits, the only thing though not taken out being depreciation of stock. Upon this basis, and taking $125,000 as the amount which appellant had received from the firm, according to his testimony, appellee's counsel makes in detail a full calculation of the entire profits of the business, which, without going into the figures, we will say shows, quite plausibly, that the amount received by appellant on the dissolution was the fair value of his interest.

As to the interest account, we understand it to refer to an interest account between the partners.

There is no charge in the bill, and no evidence in the record that there ever was such an account. Interest is not payable upon balances excepting by some agreement or understanding, and none such is shown.

As to the charge in respect of commissions paid to certain persons on omnibus tickets, the only evidence upon the point is the testimony of appellant, that appellee on one occasion stated to him, that in order to get the price of the omnibus fare from depot to depot raised from thirty-five to fifty cents, which was done in 1872, he had to pay two certain railroad ticket agents seven and one-half cents on each passenger carried by the firm after the advance, and that afterward appellee told him he was paying them. The agents named testified that they never received anything in this behalf. This commission upon the number of passengers so carried would amount to $8835.45, to a credit of one-half of which sum

appellant claims he is entitled.    This conversation appellee denies, and also that any such commission was ever paid. One of the persons referred to testifies that, upon application to appellant, in regard to the matter, the latter stated that he never thought witness had received any money, and thought appellee lied when he said it.    Appellant does not testify that there was any such account for commissions upon the books, nor is any such account shown by any part of the evidence; nor does it appear any where that any sum paid as commissions was ever charged to appellant.    The proof fails to establish this charge of the bill.

As to the complaint in respect to salary, the provision for $1000 a year as a salary was contained in the original articles between Parmelee, Gage, Johnson and Bigelow.    After Johnson was bought out, in 1858, there were no articles of agreement in writing ever executed, as satisfactorily appears from the evidence of Bigelow, Parmelee and Parker, although appellant testifies he is quite positive that on the back of the original articles of co-partnership there was indorsed a renewal for three or five years.    Bigelow lived in Boston for many years prior to the sale of his interest.    Appellant, for more or less of the time, was engaged in carrying on the Tremont House and the Sherman House in Chicago, was superintendent of a horse railroad in the city, and city treasurer in the city of Chicago, while appellee had the immediate and active charge of the business of the firm, devoting his whole time and attention thereto:

Although, in the infancy of the business, and the earlier period of the city, $1000 per year might have been a reasonable salary, as the business increased, as the evidence shows it did, largely, in its proportions, it would seem just and reasonable, and natural and probable, that there should have been an increase of salary; and the evidence shows that appellee's salary was increased, from time to time, until it reached the sum of $4000 per annum.

This is stated by Bigelow and appellee, to say nothing of

the statements of John W. Parmelee his son, and Parker, of the same thing, as appearing upon the books.

Appellant denies that he ever had any knowledge of any increase in the salary over $1000 per annum, or that he ever assented to any such increase.

Appellee testifies that appellant both knew of it, and assented to it. Bigelow's evidence, in this regard, is to the effect that appellee's salary was increased, from time to time, after Johnson was bought out, as the business increased, and that the highest salary paid was $4000, though he does not state that appellant knew anything of it. We can not but conclude, from the evidence, that the increase of salary was made, and that it was with the knowledge and assent of appellant.

There is another thing testified to by appellant, although the bill makes no such charge, to-wit: that, while he was a member of the firm, appellee told him that he had paid, from time to time, between $7000 and $8000 to Charles H. Moore, a member of the firm of James E. Lyon & Co., and that he had charged it up to himself and appellant. Moore, after testifying to the existence of the firm of James E. Lyon & Co., of Central City, Colorado, composed of James E. Lyon, Gage, Parmelee, himself, and one Towne, and its dissolution in 1865, states that Gage and Parmelee had not paid any moneys before or since the dissolution of the firm of James Lyon & Co., on his account personally, to his knowledge or request.

Under this testimony, it is claimed for appellant, that he is entitled to one-half of that amount, to-wit, $4000. Appellee denies the statement of appellant in this regard, and says that the firm of James E. Lyon & Co. was a mining company, and very unfortunate; that they were sued in New York, in Colorado, and in Chicago; that Moore refused to pay up, Lyon said that he could not, and the firm debts came on the other partners, and they had to pay them; that on the New York law suit he had paid from $5000 to $7000, and Moore

had only paid $400; that the loss fell on Gage and Parmelee, and was paid, and charged half and half to each. This is, doubtless, what appellant's testimony on this subject has reference to.

The testimony of Moore is carefully restricted to a mere denial of payment, *on his account personally*, to his knowledge or request, and we do not see but what it consists with the testimony of appellee in this respect. Had there really been any mistake or fraud in respect of this payment, it is singular that it should not have been mentioned in the bill, among its other charges. We think this matter should be discarded from consideration.

The general charge, that the books of account, if properly examined and settled, would show other frauds, we conceive, adds nothing to the specific charges, and is an allegation not entitled to be considered in a bill praying for the opening of accounts and a settlement between the parties.

Upon a more general consideration of the case, it appears that, in the transaction in question, there was no reliance upon any confidential relations before then existing between the parties; that appellant had, for his assistance, experts and friends, relying upon nothing which appellee said or did, not trusting the book-keeper, John W. Parmelee, the son of appellee, who had had charge of the books of the firm for eight or nine years; so that the parties were dealing at arm's length.

Parker was the book-keeper selected by appellant himself to make the examination of the books.

Two of the three mutual friends called in to aid, made an examination and appraisement of the personal property; Parker was the old book-keeper of the firm, who had kept the books from 1855 to 1865; the book-keeper who succeeded him, John W. Parmelee, had been instructed by Parker, and had kept the books down to the dissolution, upon the same plan introduced by Parker.

Parker was engaged about a week, and seven or eight hours

22—87 ILL.

of each day, in the examination of the books. He produced a detailed statement of account; also, a statement as the result of that examination. There is nothing in the record to show that that statement of account, or the other statement, was wrong in any respect. According to that statement of account, taking into account the personal property of the firm on the one side, and its debts on the other, appellant's interest was only about $8000, as stated by Mr. Richmond, one of the three mutual friends who assisted in making the settlement.

But appellant's counsel impugn this statement of Richmond as being an erroneous deduction made by the witness, as shown by his further following testimony: He said, " The two lines,

D. A. Gage account,     -     -     -     $33,437.00
Parmelee's account,    -     -     -     -     25,392.31

Show that Mr. Gage's account is $8000 more than Mr. Parmelee's. Those accounts were taken from their individual accounts. It shows them. That is the only way I know. I judge that those entries were taken from the individual accounts in the book. I have no other knowledge. Parker never told me what those items showed. Parker did not explain the statement at all. We put our own interpretation upon it."

But Parker testifies as a witness, and he does not state that this amount is a wrong showing of appellant's interest by the witness' statement of the account; he is not inquired of upon the subject, nor asked to make any explanation whatever of his statement of account. If there had been the error in this respect now claimed, we should think it would have been attempted to be shown by this witness, who knew all about the matter. All that he says is, the statement does not show the balance due David A. Gage; it shows the state of the business.

It is complained that this examination of the books by Parker was very imperfect, incomplete, and very much curtailed. Parker was employed to make an examination of the

books in order to the statement and settlement of the accounts between the parties. He spent a week upon the work, and produced his result. He took his own time, as he thought sufficient for the purpose, we may suppose, without any hindrance, interruption or curtailment whatever, so far as appears. He merely says, he could have made the examination more full, if he had had more time, not intimating that the examination was not sufficiently full for his own satisfaction, and for the purpose required. He says he made out the statement for the purpose of handing it to Loomis, Richmond and Hall, who were to sit as arbitrators. We must think he regarded it as sufficient for them to make a decision upon.

When Bigelow sold out, in the spring of 1871, only one day's examination of the books by Parker, and only two or three days of negotiation, sufficed the purpose of the parties.

Bigelow testifies that the negotiation for that purchase of his interest was mainly conducted by appellant, and that the latter made the proposition of the terms of purchase, which were accepted by Bigelow. That purchase from Bigelow gave appellant a recent opportunity to become acquainted with the condition of the firm's affairs. As further opportunity in that way, it appears that the partners, Bigelow and appellant, were furnished with monthly statements in writing, showing the gross amount of all the earnings and disbursements during the month. Appellant admits the receipt of such statements up to 1865, and says, after that, John W. Parmelee rarely furnished them. John W. Parmelee says he furnished them until appellant lost one upon the street, when he requested no more to be sent, saying that he would call at the office and take them from the books. The evidence shows that appellant called almost every day in the office, and frequently examined the books, though he testifies that he did not look into the books, further than the cash book, to see what the daily receipts were; that perhaps every day he would look at the cash receipts.

It would seem, then, that the settlement was approached by

appellant with a pretty good general knowledge of the condition of the affairs of the firm.

The persons assisting in the settlement presented to appellant the result as shown, as they found from Parker's examination; that $8000 was the balance due appellant from the concern, and stood to his credit. The arrangement proposed was, that appellee should assume the indebtedness of the firm, take the personal property, and pay appellant $8000. Appellant was dissatisfied with the amount of $8000. The testimony is, that he found no fault with the account as rendered, or the basis on which the balance of $8000 was figured, but claimed he should be allowed something for the good will of the business, for interest, and made objection as to the salary of appellee being more than $1000. This, by the way, answers the charge in the bill of mistake in regard to more than $1000 salary being charged, and that appellee fraudulently suppressed the fact that any larger salary than that was charged upon the books. It also shows that, not only the question of salary, but that the matters of interest and good will, which are complained of in the bill, were also then considered. Appellant refused to accept $8000, and the matter of the settlement seemed, for the time, to have fallen through. Afterward, appellee made a proposition, through Mr. Hall, which both Hall and Loomis approved, and advised appellant to accept, which he did accept, and thus the settlement was effected. The proposition was embodied in the agreement in writing, signed and sealed by the parties. It would thus appear that appellant lumped off his interest for a gross sum, without special reference to what was shown by the books, or what was the actual estimated value of his interest, thus disposed of. By the agreement of settlement, appellant released his interest in the personal property and assets of the firm, appellee assumed the payment of all its debts and liabilities, and paid appellant $13,000 in bonds of the Consolidated Gregory Mining Company, and also placed to the credit of appellant, upon the books of appellee, the further sum of $5000, to be paid to and

for the use of appellant, in the manner therein specially mentioned.

The $5000 was placed to the credit of appellant on appellee's books, which appears to have been exhausted, and the balance of the account turned against appellant in a short time, and in reply to appellee's request to settle up the balance against him, appellant, on October 10, 1874, about seven months after the settlement, writes to appellee as follows:

"<em>October</em> 10<em>th</em>, 1874.

"FRANK PARMELEE, ESQ.:

"<em>Dear Sir</em>—I regret, very much, that I am unable to pay, in cash, all claims against me, on presentation; but I feel confident that, within a few weeks, I shall be in a condition to pay your claim. Mr. Loomis will return in a few days, and then I shall be pleased to pay you back part of the bonds I took of you in January last—enough to cover your claim.

Yours, etc.,

DAVID A. GAGE."

On the 21st of November, 1874, appellant gave appellee an order on H. G. Loomis, directing him to pay to appellee what might be owing to him on settlement from appellant out of the avails of fifteen bonds which Loomis held, belonging to appellant. At that time, according to appellee's uncontradicted statement, appellant was indebted to him in a sum exceeding $5000, for moneys advanced upon matters referred to in the agreement of settlement, over and above the $5000 placed to his credit. Here would seem to have been, substantially, a ratification of the settlement quite a length of time after it was made. The present bill was not filed until July 7, 1875.

There remains another extraordinary and disagreeable feature of the case to be adverted to.

It appears that, before the filing of the bill herein, it was exhibited to appellee, and he read it, on the 1st day of July, 1875. On the 3d and 5th days of July, 1875, by appellee's orders, his clerks took all the books and papers of the firm

of Parmelee & Co.—making a bulk, in appellee's language, of half a cord—to another part of the city, and burned them in a furnace. Before characterizing such an act according to one's natural prompting, it may be proper to hear the excuse of appellee. He says that he was induced to do the act from a statement brought to him, as having been made by appellant, that he was going to file a bill against appellee, for the purpose of exposing his business to the public; that he did not know that he should make anything by filing the bill, but that he wanted to expose appellee's business to the public. A color of probability of this being the reason for the act, is lent by the fact. that, from the examination of the books, and the transcript made from them by Parker, there would not seem to have been any very great object in destroying the books for the mere purpose of the suppression of evidence.

If the real reason and motive for destroying the books were to prevent exposure to the public of the business transactions of the firm, and not to destroy evidence in this suit, the act should be viewed differently, and the adverse presumption be not so strong as if the latter had been the purpose. Still, the act deserves severe reprehension, and affords just ground of presumption against the perpetrator. The maxim is, *omnia præsumuntur contra spoliatorem,* and appellant's counsel press this into their service as a very strong auxiliary, almost to the extent of insisting upon a literal application of the maxim in the full breadth of its terms, so as to presume a case against the appellee.

In Best on Evidence, vol. 2, p. 704, § 414, the author says: "However salutary, and in general equitable, the maxim, *omnia præsumuntur contra spoliatorem,* must be acknowledged to be, it has been made the subject of very fair and legitimate doubt whether it has not occasionally been carried too far," citing authorities to such effect.

The destruction of evidence, and the refusal to produce it, when in the party's power, are treated in the books in the same connection, and as attended with somewhat similar results

in the cause. In the case of *Law* v. *Woodruff, Admr.* 48 Ill.
399, the defendant below, having refused to produce certain
letters, or to give any explanation of his refusal, the court
below had given an instruction to the jury, authorizing them
" to put the strongest construction upon the defendant's let-
ters which they will reasonably bear against him,　 *　 *　 *
for the law presumes that they contain evidence against him,
or he would not withhold them from the jury." This court
said: " This instruction fails to state the law correctly, and,
under the unsatisfactory evidence in the case, was calculated
to mislead the jury, to the prejudice of the defendant. As a
matter of law, no such inference can be drawn."

In Wharton on Evidence, vol. 2, § 1268, the author, after
citing several authorities upon this subject, says : " It follows,
therefore, that the presumption, arising from mere non-pro-
duction, can not be used to relieve the opposite party from the
burden of proving his case." And see *Chaffee* v. *United States,*
18 Wall. 516 ; *Joannes* v. *Bennett,* 5 Allen, 169.

This culpable act of the destruction of the books justly
prejudices the case of the appellee, and we have the inclina-
tion to give to it the full legitimate effect against him that
may be warranted. But we do not see how, under the proofs
in the case, it can be made avail of here, to the advantage of
appellant, unless there be allowed to it the effect of supplying
proof. This, we do not think, can rightly be done. Proof
must be made of the allegations of the bill. The destruction
of the books does not make such proof. The presumption of
law does not go to that extent.

In the weighing of conflicting testimony, there might be
scope for the operation of this presumption against the appel-
lee ; or, in the denial to him of any benefit of secondary evi-
dence. But we do not see wherein the case of appellant can
be helped in either of these ways. The only conflict of evi-
dence there is, is produced by his testimony ; and, where it
conflicts with that of appellee, the latter is corroborated to
such an extent by other testimony, and by circumstances, as

to overbear the testimony of appellant; and of secondary evidence of the books, appellee has no need.

So, too, if there were a contrariety of evidence in respect of anything testified to as appearing upon the books, this presumption of law might strengthen and add weight to any testimony in such regard, favoring the case of appellant. See *Livingston* v. *Newkirk*, 3 Johns. Ch. 315. But we discover nothing of this kind. In respect of none of the particulars wherein the bill seeks to impeach the settlement, do we find anything in support of the charges testified to as being shown by, or appearing upon, the books.

There is but conjecture, that the books, if produced, might furnish evidence in support of the allegations of the bill.

The settlement here, and the agreement in writing, under the hands and seals of the parties, appear to have been fairly and deliberately made. Such transactions should not be lightly set aside. We think no sufficient ground has been shown for setting them aside in this case. The allegations of the bill we do not find to be sustained by the proofs, and the decree dismissing the bill must be affirmed.

*Decree affirmed.*

Scholfield, C. J., Breese and Scott, J.J.: We do not concur in this decision.