Cartier v. Troy Lumber Co.

## ANTOINE E. CARTIER
### v.
## THE TROY LUMBER COMPANY.

| 35 | 449 |
| 44 | 344 |
| 138s | 533 |
| 35 | 449 |
| 51 | 466 |
| 35 | 449 |
| 63 | 254 |
| 35 | 449 |
| 71 | 553 |

*Sales—Lumber Plant—Fraud—Enumerators—Bribery—Evidence—Instructions—Practice.*

1. Only prejudicial errors justify reversals.

2. Whether upon the evidence a certain agreement amounted to the abrogation of a previous contract is a question of fact for the jury.

3. In an action brought to recover damages for the alleged fraud of the defendant, growing out of the bribery of enumerators chosen by himself and the plaintiff to determine the amount of timber and logs on certain land, to the end that they should underestimate the same, a contract of sale thereof from plaintiff to defendant having been previously entered into, this court declines, in view of the evidence, to interfere with the verdict for the plaintiff.

4. Where a jury takes figures from the calculations of counsel on both sides of a case on trial, one of the parties can not complain thereof.

5. An instruction requiring the plaintiff to prove his case by a clear preponderance of the evidence is too strongly worded.

6. Instructions informing the jury as to what they may or may not infer from the non-production of books and papers, should not be given.

7. It would seem that the control of a court over the addresses of an attorney in a given case, is limited to confining him in his opening to what may fairly be anticipated as probably coming in issue during the trial upon the facts as the advocate states them, and in his closing to the evidence which has been put in, and in both, preventing obscenity and profanity, and within very indefinite bounds, restraining license and intemperate speech.

[Opinion filed March 10, 1890.]

APPEAL from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge, presiding.

Messrs. THOMAS BATES, D. V. SAMUELS, E. E. BENEDICT and T. J. RAMSDELL, for appellant.

Messrs. TENNEY, HAWLEY & COFFEEN, for appellee.

GARY, P. J.   In 1883 the appellees and the appellant made a contract for the sale, by the former to the latter, of a large lumber plant in Michigan for $190,000, provided the timber and logs on the land should be fifty millions of feet or more; the amount of such timber and logs to be determined by an estimate to be made by two estimators, each party to select one, who, if they could not agree, were to select a third; and in case the estimate should be less than fifty millions, then for each thousand feet less a reduction of $2.25 per thousand to be made from the price.  The terms were $50,000 down, and the residue in three annual payments, with seven per cent interest, and secured by mortgage on the property.   The appellees selected one Nielan and the appellant one Stronach as estimators, and the estimates were, by the former, 27,050,000 feet, and by the latter, 25,770,000 feet.   Urged by the president of the appellees, and with the assent of the appellant, the estimators, instead of selecting a third estimator, came together, and between themselves agreed upon 26,665,441 feet, which the parties accepted.   The appellant had paid $1,000 to the appellees to be applied on the first payment of $50,000, and professed, when the estimate was settled upon, to be so much dissatisfied with the result, as the quantity fell so much short of what had been expected, and timber and logs were the principal inducement to him to purchase, that he was willing to forfeit the $1,000 and abandon the trade. The appellees seem to have been very anxious to sell, and, after negotiations, the parties agreed to consummate the sale, the appellees abating $5,000 of the price, and the sale was

then made in substantial accordance with the previous contract.

June 1, 1888, this suit was commenced, based upon the charge that the appellant bribed the estimators to make an estimate several millions of feet less than the quantity of timber and logs they actually found, by means of which the appellees were deceived, and defrauded out of a large sum of money. The appellees obtained a verdict and judgment, but as in the motion for a new trial there was no reason assigned that the verdict was excessive, that is not a question in the case.

The first point made in the brief for the appellant—that the court should have given at his request an instruction "that under the law and the evidence the plaintiffs could not recover"—is based upon the assumption that the negotiation ending in an abatement of $5,000 of the price, was an abandonment of the preliminary contract, and that therefore the declaration, charging fraud in the means by which they were induced to carry it out, with a total reduction of $57,501.75 from the contract price of $190,000, was not proved. Whether, upon the evidence, that assumption was true or not, would in any case have been a question of fact for the jury, and not of law for the court.

But the jury would not have been justified in finding the assumption true. The contract contemplated that there might be a shortage in the quantity of timber and logs, and consequent reduction in the price; and the only modification of the original contract was, that as that shortage so far exceeded expectation, a further reduction of $5,000 was made in the price. It is undoubtedly true, as appellant's counsel allege, that much of the testimony on the part of the appellees came from very suspicious sources, but the credibility of witnesses is for the jury.

The court could not have directed a verdict for the defendant because the witnesses for the plaintiff were not worthy of belief.

The record of the evidence in this case consists of nearly nine hundred pages. A few minor questions are made upon

the evidence, which have been considered, but the time and
space necessary to review them in detail would not be usefully
devoted to that purpose.    There are two serious and impor-
tant questions on the record.    The first to be considered is on
this instruction, given for the appellees:

"If you believe from the evidence that the defendant, Car-
tier, has in his possession or under his control, so that he
might have produced them, books or papers which contain
evidence material to the case, which he has not produced in
evidence, you have a right to presume that such books and
papers, if produced in evidence, would be injurious to his
case, unless you find that such presumption has been refuted
by the other credible evidence in the case."

This comes very near if it does not pass the danger line.
E. & W. G. R. R. Co. v. People, 96 Ill. 584.    It ought not to
have been given.    The practice of instructing the jury as to
what they may or may not infer from circumstances in evidence
is one not warranted by the statute.    Sec. 51, Practice Act.

But it does not follow that the judgment is to be reversed
because it was given.    The principle that "courts of review
reverse only for such errors as may have been prejudicial to
the complaining party" (Heckle v. Grewe, 125 Ill. 58), has
been so often repeated in the reports of this State, that it
would be mere ostentation to cite cases.

For two reasons this instruction did no harm.

The first is that it is true, and would be a proper direction
to a jury under the common law system, where the judge sums
up and comments upon the evidence, aiding the jury to the
extent of his ability in arriving at a right conclusion.    Secs.
2292–2294, 2 Thomp. Trials; 3 Ch. Gen. Pr. 913.    Courts of
equity constantly act upon such presumptions everywhere.
Gage v. Parmelee, 87 Ill. 329.

The second is that the verdict would have been the
same without as with this instruction.    This proposition
requires some statement of the evidence, and also something
of a history of the trial.    And the main burden of the com-
plaint of the appellant relates to the manner in which the case
was tried.

It must be conceded that the two addresses of the advocate who opened and closed the case before the jury, were remarkably energetic. The argument of an advocate will, as to the matter of it, be determined by his ability and education as a lawyer; as to the manner of it, by his taste and education as a gentleman. The control of the court over it is probably limited to confining the advocate, in his opening, to what may fairly be anticipated as probably coming in issue during the trial upon the facts as the advocate states them; and, in his closing, to the evidence which has been put in; and in both, preventing obscenity and profanity, and within very indefinite bounds, restraining license and intemperate speech.

If the evidence during the trial places either the opposing party or a witness in an unfavorable light before the jury, whether he shall attack with the coarse bludgeon of abuse or the more polished weapon of sarcasm—whether he shall denounce or ridicule—must be left for him to determine. The court can neither dictate a good argument nor prevent a bad one.

The corrective which the wisdom of the common law provided against the intemperance of counsel has been abolished in the greater wisdom of the Legislature, and that " summing up of the judge" to which Chitty attaches such importance, is no longer allowed to aid the jury to come to "a just conclusion."

It could be readily seen that if, upon the trial, the appellees should succeed, without calling either of the estimators as a witness, in making probable the charge that the appellant had bribed them, he would be almost compelled to call them, if accessible, in his own defense. In his opening, the appellees' counsel said that he expected the appellant would put Stronach on the stand.

" I want to state this right here—we expect to prove if they do—and I want it understood that this is on the theory that they put Mr. Stronach on the stand—of course, if they notify me that they do not intend to produce him as a witness, I have nothing to say. But I shall assume that they intend to put him on the stand until I am notified to the contrary."

Then he paused a moment, and no reply being made by counsel for appellant, he went on with a detail of negotiations between the appellees—through attorneys D. K. Tenney and McPherson—and Stronach, during which, Stronach having confessed the bribery, they had offered Stronach: "If you will produce those documents and that estimate, and make a clean breast of it, just as it is, we will pay you $4,000." Among the documents, as counsel stated, was a letter from Nielan to Stronach impliedly admitting the bribery. Witnesses for appellees, conceded to be of doubtful credibility, but in a position to know the matters of which they spoke, testified that the appellant paid Stronach $2,000 and promised Nielan the same, who did not want to take the money immediately, and the $4,000 was charged on the books of the appellant as expenses, and the $2,000 for Nielan credited to "bills payable" to "N.," and that in a written contract for a partnership in about half of the lands, half of the $4,000 was charged to the partnership. That when the estimates were made, Stronach prepared maps of the parcels of land, with the quantities of timber and logs upon them, respectively, of which the total footings were about 37,000,000 to 38,000,000 feet, which maps the appellant kept. This testimony was in depositions taken long before the trial, so that the appellant had ample notice of it. It was a fair conclusion upon the evidence relating to that subject that $2,000 was ten times a fair compensation for the services of Stronach. On the trial the appellant was a witness, and admitted the payment of $2,000 to Stronach; did not deny the charge of expenses in the partnership contract; admitted that that contract was in the hands of his attorneys in Michigan; admitted the credit to "N." in his books, but denied all knowledge of how or why it got there or what it meant, but did not produce his books or the contract. He denied possession of Stronach's maps, and said Stronach kept them. He called Nielan as a witness, but not Stronach, though it appeared that he and his attorneys had been in communication with Stronach during the trial, and the attorneys produced what they called the sectional maps, which they said they had obtained from Stronach during the

trial, and offered them to the other side to put in evidence, but without any evidence that they were the originals. No reason for not calling Stronach appeared. There was no direct evidence of the pecuniary condition of the appellant. In the closing argument of the counsel for appellant, he said that Stronach's absence, coupled with the offer stated in the opening for appellees, showed either that Stronach was frightened away by the opening statement, or that the appellees had paid him his price to keep him from testifying. That the case was a blackmailing conspiracy, and D. K. Tenney knew it and was helping it through. That the appellees had to bring counsel down from Wisconsin to lend respectability to the case. That the appellant, by his industry and honest dealings, had amassed a fortune and won the confidence of all his acquaintances.

Through the door thus opened by the counsel of the appellant, the counsel for the appellees marched. He made a statement as to the wealth of the appellant, but that could only affect the amount of damages if vindictive damages were given, and, as before stated, the amount of damages is not a question in the case. All the rest of his speech, with one exception—to be stated—was either comment upon or inference from what appeared during the trial before the jury.

The comments were sometimes coarse; the inferences may or may not have been just, but he had the right to urge them upon the jury. The exception alluded to is as follows:

"My friend * * * says that there is one of two theories, either of which will account for Stronach's absence. First, that the plaintiffs have frightened him away; and second, that he has been paid his price, and therefore remains away. We did try to get Stronach to come here. Why? Not because we cared a continental for his oral testimony. I wouldn't give a snap of my finger for a man who has deliberately committed such an outrageous fraud as this, to go on and admit it. What did we want? He had gone to Mr. McPherson and stated to him that he had the sectional maps; and that he had a letter from Nielan giving the whole thing away. The letter of Nielan and the sectional maps we wanted

because, gentlemen of the jury, those two things combined prove our case.

"They say here that Mr. Stronach has been frightened away, or has been paid his price to keep away. Why, gentlemen of the jury, if we had gone over there and tried to do anything corrupt, and Mr. Stronach was on the other side, why he would come in here and go on the witness stand and swear that we had gone over there and offered him money to come in here and perjure himself. Don't you see? It would give our case a terrible black eye if we didn't have testimony to show the true inwardness of the scoundrel. If he was honest was there any reason why he should stay away and fear going upon the witness stand? No, that theory won't wash. Take the other—that he has been paid his price—and yet my friend * * * , my friend * * * has been in constant communication with Stronach, and has been confidentially getting hold of some things—some little sectional maps that Mr. Stronach made in 1883."

The counsel for the appellant, having made the opening on the part of the appellees the basis of a part of his argument to the jury, both in his reference to D. K. Tenney and to the probable causes of the absence of Stronach, authorized a reply to that argument upon the same basis.

The appellant's counsel having assumed that the absence of Stronach was to be attributed to facts derived from that opening, warranted a reference to the context as the basis of an argument that the presence of Stronach was desirable by the appellees. Both parties, on the trial—the appellant first—asked the jury to take figures from the calculations made by counsel, which the jury did; the appellant can not now complain of that. Other matters complained of are of minor importance, and this opinion is already too long. The testimony of Walkup as to conversations with Lyon, was in reply to the testimony of Lyon as to those conversations; the letter from Nielan to Lyon is not in the record, and, if for no other reason, can not be considered because the court can not see that it is relevant.

The instructions asked by appellant requiring the appellees

Cartier v. Troy Lumber Co.

to prove their case by a *clear* preponderance of the evidence, is too strong.    Crabtree v. Reed, 50 Ill. 206.

There is no error in the case which could have affected the result, and the judgment must be affirmed.

*Judgment affirmed.*

MORAN, J., dissenting.  It is the policy of the law to secure to parties who come into courts for the settlement of their disputes, a fair trial.  The approval of a verdict secured by unfair means must necessarily lead to an impure administration of justice.  It is the constant practice of reviewing courts to set aside verdicts when incompetent testimony has been permitted to go to the jury for their consideration, and this is done upon the theory that irrelevant or incompetent matter having been introduced into the case, the party against whom the verdict has gone has not had a fair trial; that there has been no just test of the merits upon relevant and competent evidence.

In the class of cases in which the prejudice or passion of a jury is easily aroused, the rule that the verdict should not stand where any improper element has been wrongfully forced into the case, by party, court or counsel, finds most just and frequent application.  This case belongs to that class.  The charge is fraud, the amount claimed large, and the facts alleged against the defendant of a nature well calculated to awaken indignation and give rise to prejudice.

The evidence is conflicting, and upon points essential to appellees' case it does not seem to me to at all preponderate in their favor.  Appellant appears to have admitted, at all times and to every person who inquired of him with reference to it, that he paid to Stronach $2,000 for estimating the timber on the land which he purchased from appellees.  Allowing that to be an excessive price, and that it indicates that Stronach was corrupted, yet it does not make out the case.  It is still necessary to show that Nielan was reached and bribed to return a false estimate.

Nielan went upon the stand and testified to the honesty of his estimate, and denied that he was paid any money by appel-

lant. There was no evidence in the record which tended to impeach the character of Nielan. He stood before the jury as a witness fair in character and practically uncontradicted by evidence in the case. But the statements of appellees' counsel, in the opening and closing of the case, as completely blasted Nielan's character before that jury, and as effectually contradicted his evidence on the stand, as the introduction of a letter in Nielan's handwriting and signed by him, in which he stated, in terms, that he had been bribed by appellant and had returned a false estimate on the land, would have done. The counsel's opening may have been legitimate when consid, ered by itself, and it may be true that a portion of the closing argument to the jury was, but a fair answer to the argument of appellant's counsel. But the most telling and injurious part was not, in my opinion, either invited or excused by anything that appellant's counsel had said. Nothing said by him justified the direct and positive statement to the jury, by appellees' counsel, in telling why he wanted Stronach as a witness, made in these words: "He had gone to Mr. McPherson and stated to him that he had the sectional maps, and that he had a letter from Nielan giving the whole thing away. The letter of Nielan and the sectional maps we wanted, because, gentlemen of the jury, those two things combined prove our case." Counsel was quite right in saying that these two things proved the case. Indeed, a letter from Nielan giving the whole thing away would prove the case without the maps. But the letter from Nielan was before the jury by the statement of counsel as fully, and as injuriously for appellant, as if it had been produced and read to them.

While it is true that the credibility of witnesses is for the jury, it is to be judged of by the jury in view of all the *competent* evidence in the case. Nielan's credibility was weighed with a belief in the minds of the jury that he had written a letter, in terms acknowledging his guilty participation in the alleged fraud. There was not one word of legitimate evidence before the jury that reflected upon Nielan's honesty or truthfulness. Suppose no word had been said during the trial about the alleged letter, is it possible for this court to say that

the jury would not have believed Nielan? Is it just or fair to assume that without this illegitimate but crafty and effective attack upon him he would not have been believed? It is admitted "that, much of the testimony on the part of the appellees came from very suspicious sources." How, then, can it be said, as an affirmance of this judgment in effect does say, that the verdict would have been the same had the trial been fair?

Considering the opening and closing arguments of counsel together—as, in view of the unwarrantable and inexcusable statement above quoted from the closing they must, in my opinion, be considered—and it appears to me an inevitable conclusion that the jury was influenced to an extent practically impossible to estimate against the defendant and his witnesses. The court directed that the counsel should not be interrupted in his closing speech, and was, during the making of said speech, absent from the court room hearing some motions, and thereby the privilege and advantage of timely protest against statements of matter not in evidence was denied to appellant. The effect of the order of the court which secured to counsel immunity from interruption should be to compel him to use his privilege with an honest observance of the responsibilities it imposed, and to confine him strictly to a discussion of the *evidence* in the case.

To approve of such statements as were made in the case apparently for the purpose of affecting the deliberation of the jury, or of influencing their passions or prejudices, or otherwise leading them to decide the question on matter which the jurors' oath and the judge's duty both required should not enter into their consideration, is, as it seems to me, a departure from the primary principles of justice. When such acts are not restrained or corrected by the trial judge, and it may be said that such acts are not errors of the judge (McDonald v. People, 25 Ill. App. 377), this court ought to follow the course of the Supreme Court of Iowa, when a similar question was presented in Martin v. Orndorff, 22 Iowa, 504, when the court said: "We therefore deem it the safer and better course to hold that it was error of prejudice, and to check and

disabuse a practice to which we have witnessed an occasional tending, and which, if indulged in, would cause a departure from long and well settled rules." I am of opinion, too, that the instruction given with reference to the presumption to be indulged in from the failure of defendant to produce his books, was an erroneous and injurious suggestion, under the facts in this case. The only item or charge which appellees claimed was in defendant's books which tended to support their witnesses, was the item of $2,000 credited to bills payable, "N." This item defendant frankly admitted, when on the stand, was in the book, and said that he was unable to explain it. The fact of the existence of the charge or item being thus admitted, what basis was there for the damaging suggestion that the jury might presume the books would be to some further extent injurious to defendant?

The effect of such a hint from the court might well lead the jury to find in the authorized presumption all the evidence which they might believe was otherwise lacking in the case. Instructions of this nature are usually regarded as invasions of the province of the jury. And when given under such circumstances as appear in this case, they strike, with a force not readily estimated, the party against whom they are aimed.

I am therefore unable to say that the judgment appealed from should stand. If there had been nothing improper on the trial, the evidence having been conflicting, the verdict would be conclusive, but a verdict is conclusive in such a case only when there is no error and the trial has been fair.