STANLEY DOLLISON, Plaintiff-Appellee, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY et al., Defendants-Appellants.

First District (1st Division)    No. 60175

Opinion filed September 7, 1976.

O'Brien, Redding & Hyde, of Chicago (Donald J. O'Brien, Jr., Dom J. Rizzi, and Jack R. Pine, of counsel), for appellant.

James P. Chapman, Ltd., of Chicago (James P. Chapman, William J. Harte, and Edwin R. McCullough, of counsel), for appellee.

Mr. JUSTICE BURKE delivered the opinion of the court:

Stanley Dollison brought an action based upon negligence and product liability against The Chicago, Rock Island & Pacific Railroad Company ("Rock Island"), the Penn-Central Railroad, and Unarco Industries, Inc. Dollison, a janitor for the Campbell Soup Company, suffered injuries when he was struck by a 700-pound steel load divider door which fell from its attachment located beneath the ceiling of a railroad boxcar. The Rock Island is the owner of the boxcar; Unarco is the manufacturer of the door; and the Penn-Central is the servicing railroad for the Campbell Soup loading docks in Chicago. After a lengthy trial, the jury returned a verdict of $75,000 for the plaintiff against the Rock Island. Defendants Unarco and Penn-Central received favorable verdicts. The trial court denied Rock Island's post-trial motion, and this appeal followed.

The Rock Island contends that: (1) the trial court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict; and (2) the verdict is against the manifest weight of the evidence. The Rock Island does not contend that the award of damages is excessive; that proximate cause is lacking; that plaintiff is guilty of contributory negligence; or that any tendered jury instruction or evidentiary ruling is

erroneous. We shall review the evidence pertinent to Rock Island's appeal.

Leroy Bertram, the plaintiff's first witness, testified under section 60 of the Illinois Civil Practice Act. (Ill. Rev. Stat. 1973, ch. 110, par. 60.) Bertram has been employed by Unarco since 1967 and is currently vice-president of engineering of Unarco's Equipco Division. Prior to his employment by Unarco, Bertram was employed for several years by the Pennsylvania Railroad Company. Bertram is extensively experienced and schooled in mechanical engineering work relating to the design, construction, and maintenance of railroad freight cars. During his employment with the Equipco Division of Unarco, Bertram's duties related to the workings of load divider doors. With the use of photographs and diagrams, Bertram explained the operation and construction of the type of load divider door which fell upon the plaintiff.

A load divider system in a railroad boxcar consists of four rectangular steel doors each of which is approximately 8 to 9 feet tall, extends from floor to ceiling, and weighs approximately 700 pounds. Both upper corners of each of the four doors roll along tracks placed on the sides and in the middle of the car's ceiling. When a particular door is unlocked, it may be pushed or pulled along its tracks for the purpose of stabilizing or compartmentalizing the car's load. The length of each side of the boxcar's interior may be compartmentalized by two of the four load divider doors.

In the center portion of each door is an operating handle which is a lever device capable of being pulled out and down from an upright, recessed position. When the handle is in an upright position, the door is locked by spring-loaded pins which secure tightly to metal track located on the floor and ceiling of the car. Once the handle is pulled downward, the lock pins recess into the body of the door, enabling the door to be rolled along the ceiling tracks. When the door is unlocked, the only mechanism which supports the weight of the door in a standing position is an overhead carriage connection. The focus of this lawsuit is on the installation of the overhead carriage connection.

Above each door is a carriage body which has wheels at either end to guide the door along its ceiling tracks. The carriage body is affixed to the door itself by means of a connecting pin which is bolted to casting welded to the top portion of the door. The bolt which holds the connecting pin from the overhead carriage body to the door casting is called the pivot bolt. The pivot bolt is approximately 5 to 6 inches long and ¾ inch in diameter. If the pivot bolt is securely assembled in place, the door will remain suspended from the carriage connection when unlocked. If the pivot bolt is missing, the door will fall from the carriage connection when unlocked. However, the spring-loaded lock pins will hold the door in an upright position if the pivot bolt is missing from the carriage connection.

The pivot bolt is properly assembled by being threaded through a washer, through one end of the door's casting, through the connecting pin from the carriage body, and out the other end of the door's casting. An adjustment washer followed by a lock washer, hex nut, and flat washer are placed in sequence on the bolt. A cotter pin is inserted in a hole at the end of the pivot bolt.

Bertram testified that the lock washer operates as a safety device to prevent the hex nut from loosening under the vibration caused by normal movement of the boxcar. When the hex nut is tightened against the lock washer, a "biting action" results which prevents the hex nut from loosening. In the event the hex nut vibrates loose, the cotter pin operates as a fail-safe device to prevent the hex nut from falling off the pivot bolt. The flat washer, located between the hex nut and the cotter pin, guards against wear on the cotter pin. A flat washer would not function as a lock washer and a lock washer would not function as a flat washer. If the flat washer were inserted inside the hex nut on the bolt assembly, the hex nut would not be held in place by compression. Conversely, if the lock washer were inserted on the outside of the nut on the bolt assembly, the lock washer could wear away the cotter pin rather than protect against the pin's destruction. If the cotter pin is missing from the assembly, the pivot bolt will become dislodged from the carriage connection causing the divider door to fall.

Bertram testified that on November 21, 1967, he met with representatives from Campbell Soup, the Rock Island, and the Penn-Central to inspect Rock Island Car 6407, the car in which plaintiff was injured. With the use of a ladder, Bertram examined all four carriage connections inside the car. Bertram discovered an improper sequence on the pivot bolt assembly in the carriage connections of the three doors remaining in a locked, standing position. The flat washer was found on the inside of the hex nut, where the lock washer properly belonged, and the lock washer was found on the outside of the nut, where the flat washer properly belonged. Bertram further noticed that the cotter pins were missing from two of the three bolt assemblies of the standing doors. Bertram was unable to find any of the missing cotter pins on the floor of the car.

Chester Berkley, the area manager at the Campbell Soup warehouse, testified that nothing inside car 6407 had been moved after Dollison was injured. Introduced into evidence were photographs of the car's interior which were taken by Berkley immediately after the accident. Berkley stated that testing each load divider door for moveability was one of Dollison's duties in preparing a boxcar for loading. However, Dollison was never instructed to inspect each door's carriage connection by use of a ladder. If one of Campbell's dock foremen determined that a particular

boxcar was damaged or unfit for loading, the car would be switched out of the loading docks as a "bad order." The servicing railroad, the Penn-Central, would return the car to the railroad which owned the car.

Joseph Salapatek was examined by the plaintiff under section 60 of the Civil Practice Act. Salapatek is a Rock Island car foreman who supervises repair work performed on all cars at the Rock Island's Burr Oak Yards in Blue Island. In January or February, 1967, car 6407 was returned to the Rock Island at the Burr Oak Yards as a "bad order" car. The car's load divider doors, as well as the car's ends, sides, roof and outside ladders were damaged. Unarco advised the Rock Island that new load divider doors had to be installed because the damaged doors were not repairable. The damaged doors were removed and scrapped, and in May, 1967, new load divider doors for car 6407 arrived at the Burr Oak Yards. Salapatek received instructions from the Rock Island to place the new doors on the floor of car 6407 and ship the car to the Rock Island Yards in Biddle, Arkansas. The Rock Island conducts all major repair work on the exterior portion of its cars at the yards in Biddle, Arkansas.

During one point of his direct examination, Salapatek testified that it was the Rock Island's intention to install the new doors at the Biddle Yards. At another point in his direct examination, Salapatek stated that he did not know if it was the custom and practice of the Rock Island to replace the new doors at the Biddle Yards. Salapatek was impeached on direct examination with his deposition testimony given prior to trial wherein he stated that Rock Island employees would have installed the new doors as well as repaired the exterior damage of car 6407 at the Biddle Yards.

Salapatek kept in his possession for one year a ledger book which contains a record of the movement of car 6407. Pursuant to instructions from the Rock Island, the ledger book and Salapatek's written order relating to repair instructions for car 6407 were destroyed at the Burr Oak Yards. Salapatek stated that he had no further knowledge of any record pertaining to the repair work conducted on car 6407. Salapatek did not testify that any other records maintained by the Rock Island at Biddle, Arkansas were destroyed. Salapatek's testimony does not indicate that it is the policy of the Rock Island to destroy all business records or certain types of repair records on a widespread basis at all company offices.

Salapatek further stated that all four load divider doors would be installed at one time as a unit. Never in Salapatek's 36 years of experience had he known of an instance when any other railroad other than the owner railroad would replace load divider doors in a boxcar. If an "on-line" railroad repaired a pivot bolt assembly in a carriage connection, a bill would be sent to the railroad which owned the repaired car as a matter of custom and practice. The replacement of a cotter pin or hex nut

would trigger the billing process for labor and parts reimbursement. Salapatek knew of no bills sent to the Rock Island by any other railroad for repair work on car 6407.

At trial in September, 1973, the Rock Island stipulated that it did not possess any documents relating to the repair of car 6407 during the times in which the car was located at the Burr Oak Yards in Blue Island or at the yards in Biddle, Arkansas. The Rock Island further stipulated that it did not possess any bills or documents indicating that any other person or any other railroad performed repair work on any part of car 6407. Moreover, the record indicates that the Rock Island never responded to plaintiff's discovery motion filed June 1, 1970, for production of documents relating to the inspection, maintenance or repair of the load divider doors in car 6407. On July 15, 1970, the Rock Island responded with the answer "unknown" to a plaintiff's interrogatory asking for the identity of the person who repaired or reinstalled the load divider doors in car 6407.

Michael Disabeto, a product representative from Unarco, testified that on March 10, 1967, he inspected the damaged load divider doors in car 6407 at the Burr Oak Yards. Disabeto recommended that new doors be installed because the damaged doors were beyond repair. A written memo, introduced into evidence, reflects Disabeto's inspection and recommendation.

Ross Murdock, manager of transportation for Campbell Soup, explained the nature of the "pooling" arrangement between Campbell and various other railroads, including the Rock Island. Campbell maintains a pool of freight cars which are exclusively employed for shipment of Campbell goods. The railroads which haul Campbell's goods contribute boxcars to the pool as a part of the exchange for receiving Campbell's shipping business. Any transporting railroad would be able to haul pooled cars owned by other railroads to Campbell's customers. (It is for this reason that the pool is termed "promiscuous" in railroad parlance.) After shipment, the pooled cars would be returned to the Penn-Central, Campbell's servicing railroad, which delivered the cars to Campbell's loading docks. Car 6407 was one of the cars which the Rock Island contributed to Campbell's pool.

Murdock stated that Dollison, as a janitor, was obligated to empty debris from freight cars and to inspect them for cleanliness. Dollison was also instructed to routinely check the mobility of the load divider doors. Murdock testified that Campbell Soup, as a shipper, was under no obligation, either by contract or by custom and practice, to inspect the bulkhead carriage connections of the load divider doors. If an obvious defect was discovered on a car by the loading dock foreman, the car was "bad ordered" and shipped out of the Campbell dock area.

The plaintiff, Stanley Dollison, testified that at approximately 7 p.m. on

November 17, 1967, he entered car 6407 for the purpose of performing his usual cleaning duties. As part of his normal procedure, Dollison attempted to move one of the load divider doors in order to remove dust, sugar, rice, oats, corn, broken beer bottles or other debris which might be found behind the door. When Dollison pulled down the operating handle to the unlocked position, the door instantly fell on him. Dollison hollered for assistance, and two other workers eventually came to his rescue.

Sam Tatum, a co-worker of Dollison at Campbell Soup, testified that at approximately 7 p.m. on November 17, 1967, he heard a sound like a door had "slammed up against something." Responding to cries of moaning, Tatum inspected car 6407 and found Dollison on the floor of the car fully covered by a load divider door. Tatum and another employee pulled Dollison out from underneath the door.

Arthur Johnson, car repairman for the Penn-Central Railroad, inspected car 6407 at the Campbell docks on November 20, 1967, to check for any safety violations. Johnson stated that he saw a bolt, nut, and flat washer next to the fallen door. Johnson did not find a cotter pin on the floor of the car, nor did he touch anything inside the car.

Joseph Edward Schuch, a car foreman employed by the Rock Island, was examined by plaintiff under section 60 of the Civil Practice Act. Schuch, with Leroy Bertram of Unarco, Ross Murdock of Campbell Soup, and W. C. Pugh of the Penn-Central, examined the inside of car 6407 on November 21, 1967. Schuch found a bolt, nut, and lock washer, but no cotter pin, next to the fallen door. Schuch examined the carriage connections to the three standing doors and discovered that the cotter pin was missing from two of the three assemblies. It was Schuch's opinion that the nut found on the floor evidenced indications of being tightened next to a lock washer.

John Hartman, manager of car accounting, testified for the Rock Island on direct examination. Hartman summarized the general movement of car 6407 from January to November, 1967. Approximately 11 different railroads delivered car 6407 to various destinations from June to November, 1967. Hartman based his testimony on a document termed an inner-change report. Hartman's report did not indicate that car 6407 was sent to the repair yards at either Burr Oaks in Blue Island or Biddle, Arkansas. Hartman stated that all wheel reports tracing the movement of car 6407 in 1967 had been destroyed. Wheel reports are records of car movement completed by conductors at major terminals.

Leroy Bertram testified on direct examination for Unarco, his employer. Bertram testified that a total of 54,000 load divider doors had been sold without receiving a report of a failure of the carriage connection if the pivot bolt assembly is properly installed. Unarco provided installation and maintenance instructions to railroads which

utilized load divider doors in their cars. Bertram stated that Unarco's records indicated instances where mechanics were not installing the load divider doors according to the proper instructions.

The Rock Island's motion for a directed verdict at the close of plaintiff's case and its motion for judgment notwithstanding the verdict were denied by the trial court. The Rock Island's first contention on appeal is that the trial court erred in both rulings for two reasons: (1) the evidence presented is insufficient to establish Rock Island's negligence, or to establish that a defective condition causing the accident existed at the time the load divider door left its control, and (2) the Rock Island had no legal duty to inspect the interior mechanisms of car 6407 prior to use by the plaintiff or the plaintiff's employer, Campbell Soup.

Our supreme court in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504, established that directed verdicts or judgments notwithstanding the verdict should be entered only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick* repudiated the any-evidence rule as an unsatisfactory standard in determining whether the evidence presented poses a substantial factual dispute which must be resolved by a jury. However, proof of negligence by circumstantial evidence will withstand scrutiny under the *Pedrick* rule if reasonable inferences of negligence may be drawn from established facts and circumstances. (*Larson v. Harris*, 38 Ill. 2d 436, 231 N.E.2d 421; *Luker v. Contract Steel Carriers, Inc.*, 103 Ill. App. 2d 296, 243 N.E.2d 6.) Moreover, proof of a defective condition within the meaning of *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182, may also be accomplished by establishing facts and circumstances from which the existence of a product defect may be reasonably inferred. *Bollmeier v. Ford Motor Co.*, 130 Ill. App. 2d 844, 265 N.E.2d 212; *Spotz v. Up-Right Inc.*, 3 Ill. App. 3d 1065, 280 N.E.2d 23.

The record before us indicates that the plaintiff established certain uncontroverted facts and circumstances. In May or June, 1967, the Rock Island issued instructions to transfer car 6407 from the Burr Oak Yards at Blue Island to Biddle, Arkansas, for the purpose of completing major repair work on the car. As part of the repair work intended for car 6407, four load divider doors, which had been shipped to Biddle inside the car, were to be installed. Load divider doors are generally installed at the same time as one operating unit. It was discovered after the occurrence that the pivot bolt assemblies on the three standing doors in car 6407 were improperly installed. The flat washer was found on the inside of the hex nut while the lock washer was placed to the outside of the hex nut in

improper sequence on all three bolt assemblies. The safety function of each type of washer was therefore precluded because each washer was in a switched position on the bolt assemblies. Unrefuted testimony indicates that an improper installation, as found on the three standing doors, would cause the door which injured plaintiff to fall as it did. It was railroad custom and practice that no other railroad except the owner railroad of a boxcar would install load divider doors. The evidence further reflects that if car 6407 had been repaired by any other railroad company, the Rock Island would have received a bill for reimbursement of labor and parts pursuant to railroad custom and practice. Any attempt to change the washer and nut sequence on a bolt assembly would have required a major effort in completely removing the 700-pound load divider door from its carriage connection. The Rock Island could not produce any bills reflecting that another railroad or an independent contractor installed the load divider doors in car 6407.

■■ When we view all the evidence presented by plaintiff, and the inferences which are reasonably drawn therefrom, in its aspect most favorable to the plaintiff, we cannot find that the evidence overwhelmingly favors the defendant so that no contrary verdict would ever stand. It is well-established that facts may be proved by reasonable inferences or by reasonable inferential sequences. (*Grand Trunk Western R.R. Co. v. M. S. Kaplan Co.*, 43 Ill. App. 2d 230, 193 N.E.2d 456; *Garrett v. S. N. Nielsen Co.*, 49 Ill. App. 2d 422, 200 N.E.2d 81.) The evidence provides a sufficient basis from which the jury could reasonably infer that Rock Island employees at Biddle, Arkansas, improperly installed the load divider door which injured plaintiff. The jury could also reasonably infer that the bolt assembly on the door which injured plaintiff contained an improper flat washer, hex nut, and lock washer sequence, as was discovered on the three other doors of the unit. Applying the rule in *Pedrick*, we conclude that the trial court did not err by permitting the jury to resolve substantial issues of fact posed by the evidence presented. The question of defendant's liability was properly one for the jury. (*Larson v. Harris*, 38 Ill. 2d 436, 231 N.E.2d 421.) Further, defendant's motion for judgment notwithstanding the verdict was correctly denied.

Defendant's additional argument in support of its first contention is that it had no duty to determine the correctness of the divider door's installation. Defendant objected to subparagraphs (a) and (b) in plaintiff's negligence count, which consists of the following subparagraphs:

"(a) Failed to determine that an Equipco Load Divider ('the Divider') in the car was properly fastened or installed;

(b) Failed to properly inspect the car and dividers in the car.

* * *

(e) Failed to install a divider door in the car in accordance with manufacturer's instructions and recommendations."

■■ A railroad which owns and furnishes a car to a shipper has a duty to exercise ordinary care to determine that the car is in reasonably safe operating condition. The railroad's duty is owed to all those persons who are employed by the shipper and who would be expected to operate the car's mechanisms. (*Pennsylvania R.R. Co. v. Hummel* (3rd Cir. 1909), 167 F. 89; *Jilek v. Missouri Pacific R.R. Co.*, 13 Ill. App. 2d 518, 142 N.E.2d 708, *Chicago, Rock Island & Pacific R.R. Co. v. Williams* (8th Cir. 1957), 245 F.2d 397.) Sometimes the owner railroad's obligation to conduct an adequate inspection of a freight car prior to the time the railroad relinquishes control is considered a primary duty. (See 99 A.L.R. 2d 176, 180, 190 (1965).) The fact that approximately 11 railroads carried car 6407 for about a five-month period before the accident does not immunize the Rock Island, as an owner railroad, from liability due to the furnishing of a car which was not reasonably free from discoverable defects. (*Albanese v. Southern Ry. Co.* (S.D.N.Y. 1955), 131 F. Supp. 307.) In this instance, the Rock Island had a duty to guard against injury to any person which may naturally flow as a foreseeable consequence of its acts. The pooling arrangement between Campbell Soup and Rock Island provided that only Campbell Soup would ship goods in certain freight cars supplied by the Rock Island. It is entirely foreseeable that a Campbell employee, performing duties like those of the plaintiff, would operate load divider doors inside the Rock Island's cars. If the jury concluded that the Rock Island improperly installed the divider doors at Biddle, Arkansas, then it could also conclude that the Rock Island ignored a dangerous condition by failing to properly inspect the defective installation of divider doors in car 6407 prior to its departure from Biddle.

Defendant's second contention is that the verdict of the jury in favor of the plaintiff is against the manifest weight of the evidence. Defendant argues that the record contains no direct evidence that an employee of the Rock Island installed the divider doors or that the divider doors left the Rock Island's control in a defective condition. The Rock Island suggests that an independent contractor could have initially installed the doors. The Rock Island further suggests that the doors could have been repaired by one of the 11 railroads which delivered car 6407 to various locations between June and November, 1967. Defendant maintains that the jury's verdict lacks evidentiary support and is based upon conjecture and speculation.

Verdicts are not considered against the manifest weight of the evidence unless an opposite conclusion is clearly evident or the finding of the jury is palpably erroneous. (*Haas v. Woodard*, 61 Ill. App. 2d 378, 209 N.E.2d

864; *Vasic v. Chicago Transit Authority,* 33 Ill. App. 2d 11, 180 N.E.2d 347.) A verdict may be based upon proof of facts and circumstances which will, according to usual and common experience, raise reasonable inferences of other facts and circumstances sufficient to warrant the jury's finding. *Devine v. Delano,* 272 Ill. 166, 111 N.E. 742.

Plaintiff's evidence is mostly circumstantial for an apparent reason. The Rock Island failed to preserve or provide any records pertaining to the installation or repair of the new load divider doors in car 6407 at Biddle, Arkansas. Two representatives from the Rock Island inspected car 6407 four days after plaintiff's injury. An action was commenced by plaintiff against the Rock Island within five months after the accident. The Rock Island had sufficient notice that a defective mechanical condition in one of its freight cars caused plaintiff's injury. However, the Rock Island did not produce any documents pertaining to the installation or repair of the divider doors in car 6407 despite a court order directing the Rock Island to respond to plaintiff's motion for production of documents. The Rock Island continued to maintain secrecy about repair work on car 6407 in its response to plaintiff's written interrogatories. Never in the discovery stages of this litigation did the Rock Island state that certain types of corporate records are destroyed after one year as a matter of course. Not one witness at trial testified that repair work records kept at Biddle, Arkansas, were destroyed due to inadvertence or normal business practice. The Rock Island further stipulated at trial that it did not possess any bills or statements from any other person who performed repair work on car 6407.

■■ An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control. (*Tepper v. Campo,* 398 Ill. 496, 76 N.E.2d 490; *Hudson v. Hudson,* 287 Ill. 286, 122 N.E. 497.) The presumption does not relieve the plaintiff from the burden of proving a prima facie case. (*Gage v. Parmelee,* 87 Ill. 329; *Walker v. Herke* (1944), 20 Wash. 2d 239, 147 P.2d 255.) Once a prima facie case is established by a plaintiff, the trier of fact may infer that available evidence which is not produced would be unfavorable to the defendant. (*Beery v. Breed,* 311 Ill. App. 469, 36 N.E.2d 591.) Since the record before us does not include all the jury instructions tendered, we are unable to determine if a relevant instruction was given (Illinois Pattern Instruction—Civil No. 5.01 (2d ed. 1971)). However, defendant did not give any reasonable explanation for the failure to produce repair records kept at Biddle, Arkansas. We believe that the jury could reasonably infer that any record relating to the repair of car 6407 would adversely affect the Rock Island's interest. (*Bubrick v. Northern Illinois Gas,* 130 Ill. App. 2d 99, 264 N.E.2d 560.) Moreover, it was entirely proper for plaintiff's counsel to argue to the jury that the Rock Island would have

produced repair documents if those documents were favorable. *LeMaster v. Chicago Rock Island & Pacific R.R. Co.*, 35 Ill. App. 3d 1001, 343 N.E.2d 65.

Strong circumstantial evidence, coupled with an unfavorable inference drawn from the nonproduction of documents, tends to prove that the Rock Island installed the load divider doors in car 6407. Defendant's counsel admitted that such an inference was reasonable in his closing summation to the jury:

> "DEFENSE COUNSEL: I want to make something clear from the beginning also, I am not standing before you, I cannot stand before you in all candor and say that we did not put his door on.
>
> Remember Salapatek's testimony? He said that was sent down to somewhere in Arkansas. The next time we hear of that car or any one sees it is the day of the accident, November 17. There was no direct proof, but he said, and I assume it was done, and I think it would be reasonable for you people to assume that the doors were put on by the Rock Island. I don't contend that they weren't.
>
> However, I do contend, and I contend very strongly, that the proof as to the manner in which those doors were put on is totally lacking. He must prove that it is more probably true than not true that we improperly installed those doors."

■■ We believe that the jury was in the best position to determine the truth by arriving at reasonable conclusions based upon common experience. The evidence presented in the record supports a reasonable inference that the load divider door which fell on the plaintiff was installed by the Rock Island in an improper and negligent manner. To seriously entertain the Rock Island's suggestions that another party installed the doors or that the bolt assemblies on the three other doors in the unit were installed differently than the bolt assembly on the door which fell on the plaintiff would be to engage in the very speculation that we are urged to avoid. The verdict is not against the manifest weight of the evidence. For these reasons, the judgment is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and SIMON, J., concur.