EYVETTE LEE *et al.*, Plaintiffs-Appellees, v. GRAND TRUNK WESTERN RAILROAD COMPANY *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 85—426

Opinion filed April 30, 1986.—Rehearing denied June 4, 1986.

James A. Romanyak and Gregory A. Stayart, both of Chicago (Schlegel, Azeris & Romanyak, of counsel), for appellants.

Herbert F. Stride, Ltd., and William J. Harte, Ltd., both of Chicago (Herbert F. Stride and William J. Harte, of counsel), for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, Eyvette Lee and four minor children, brought this action against defendants Grand Trunk Western Railroad and Eulice Davis, its engineer, seeking to recover for injuries sustained in a colli-

sion with a train. Plaintiffs were passengers in an automobile owned by Lee and operated by John Flennoy which was struck by a Grand Trunk train operated by Davis. A jury returned a verdict in favor of all plaintiffs, and awarded damages totaling $2,617,475. The trial court denied defendants' post-trial motions and entered judgments on the verdicts. Defendants appeal. Flennoy had been a plaintiff in this action, but prior to trial his suit was voluntarily dismissed.

The accident occurred at the railroad's intersection with 147th Street in Harvey, Illinois. At the crossing, 147th Street is a four lane paved street which runs east and west. There are two sets of railroad tracks in a generally southeastern to northwestern direction at 147th Street. The intersection is a grade crossing, equipped with gates, bells and flashing lights. The gates and lights are activated by an electrical mechanism located just north of the 150th Street intersection. The lights and gates were functioning properly on the evening of the accident.

The 147th Street crossing is located in an industrial and residential area. From 155th to 147th streets, a distance of approximately 1½ miles, there are seven railroad crossings. As a train approaches from the southeast, there is a curve before 150th Street. The track then proceeds straight for about a mile to 147th. Ashland Avenue is between 147th and 150th streets. There is a clear view of the 147th Street crossing from 150th, but the gate on the eastern side of the crossing is partially obstructed by a small metal building for railroad circuits. At the northeastern corner of the 147th Street intersection, approximately 20 feet from the crossing, there is a small guardhouse maintained by Wyman-Gordon industries.

On the evening of February 7, 1981, Grand Trunk train number 393 was proceeding north from Harvey to Elsdon Station, Illinois. The freight train had originated in Battle Creek, Michigan, and was enroute to its Elsdon destination. After leaving Harvey, the train consisted of 41 cars, each approximately 50 feet long. It was a dark, clear evening. The engine was equipped with a strobe light for waning and a headlight which projects 600 to 800 feet.

At approximately 9 p.m., the automobile being driven by Flennoy was traveling westbound on 147th Street. Lee was seated in the front seat. The four minor plaintiffs were seated in the back seat. They were all returning to Lee's mother's home after a family gathering. The train struck the rear of the Lee vehicle on the driver's side, and Lee and the children were seriously injured.

Lee testified that about a block before the automobile reached the crossing, she turned around to look at the children in the back seat.

Before she turned around, the crossing gates were up and no warning lights were flashing. The automobile was moving slowly because the crossing was bumpy. While her vehicle was on the tracks, it stalled and Flennoy tried to restart it. Lee turned and moved toward the door when she saw the approaching train. She tried to get out, but was unsuccessful. Lee did not recall seeing the gates or lights after she turned to look after the children. She did not hear the train sound its horn. Lee lived with Flennoy and allowed him to drive her automobile.

Plaintiff called several Grand Trunk employees as adverse witnesses. Defendant Davis had been a locomotive engineer for 25 years and was familiar with the area where the accident occurred. Davis estimated the train's speed at 35 miles per hour as it approached 147th Street. After coming out of the curve at 150th Street, Davis had a clear view of the 147th crossing. As Davis approached the crossing, he was sounding the train's standard crossing whistle. He sounded the whistle at each of the seven crossings in the area. Davis was seated on the right side of the engine's cab and operated the whistle by pulling a lever on the left with his left hand. The whistle lever was six to eight inches from the automatic brake valve lever also located to his left and operated with his left hand.

Before seeing the vehicle move onto the crossing. Davis saw the lights flashing and gate down on the west side of the 147th Street crossing after the curve at 150th Street when the train was south of Ashland Avenue. Davis's view of the lights and gate on the east side was briefly obscured by a small building. When the train was north of Ashland, Davis saw the Lee vehicle move west onto the crossing from the east and stop on the tracks approximately 150 to 200 yards away. Davis initially testified that he kept blowing the whistle until he took his hand off that lever and put the train into an emergency stop. He did not know how long the vehicle had been stopped before he put the train into emergency. He subsequently stated that he put the train into emergency as soon as he saw the Lee vehicle stop. Davis also testified that the whistle sounded all the way up to impact. He did not hear the brakeman speak to him because he was blowing the whistle.

Immediately before impact, Davis saw the lights flashing and gate down on the east side of the crossing. When impact occurred, the Lee vehicle was at an angle on the tracks, with its back part facing the train. After impact, the auto was pushed west onto the other set of tracks. Ten or fifteen railroad cars passed over 147th Street before the train stopped. Davis testified that sometimes a tape is placed on a train which automatically records the speed of the train. The speed

tape is locked and sealed; the engineer does not have access to it. Davis did not know if there was a speed tape on the train in question.

Raymond Petch, the train's brakeman, sat in the seat on the left side of the engine cab. It was his job to watch for traffic in front and on both sides of the train. When the train was just north of 150th Street, Petch saw the lights flashing and the gates down on both sides of the crossing. The train was traveling at about 30 to 35 miles per hour or about 50 feet per second. Petch noticed the automobile stalled on the tracks approximately 10 to 15 train car lengths or 500 to 750 feet away from the oncoming train. Petch did not see the vehicle drive onto the tracks. When Petch saw the vehicle, he turned to Davis and said that he did not think the vehicle was going to move. Davis assured Petch that he was aware of and in control of the situation and kept blowing the whistle. Some seconds after Petch warned Davis, Davis put the train into emergency stop. Petch stated that there was no way the train could have stopped in time to avoid hitting the Lee vehicle. Petch arose and moved to the center of the train because he did not want to get hit by debris from the imminent collision. Petch did not reach over to apply the engineer's brake or activate his own emergency brake while Davis was blowing the whistle. Petch would have to move seven to eight feet to reach the engineer's brake.

The two brakemen riding in the train's caboose did not see the collision, but testified that the train was traveling about 30 miles per hour before the emergency stop. The conductor, John Moore, stated that the train stopped 15 to 20 car lengths past the 147th Street crossing. After the collision, Moore saw the Lee vehicle two car lengths north of the crossing on the other tracks. Billy Farrer, an employee of Wyman-Gordon, was working in the guardhouse located about 70 feet northeast of the intersection. Farrer did not observe the collision, but was informed of the accident by another employee, Alvin Miller, and saw the vehicle being pushed down the track on the front of the train.

Alvin Miller testified that he previously had been employed by the Illinois Central Gulf Railroad and at the time of the occurrence was working as a security guard for Wyman-Gordon. Miller heard the train's whistle, saw the train's headlight and saw the gates go down on both sides of the crossing. The gates and flashing lights were activated for 1½ to two minutes before the collision. Miller observed the Lee vehicle stop four feet from the westbound gate for about 90 seconds. When the train was 100 to 150 feet from the crossing, the auto went around the gate and started to go across the tracks. The vehicle

turned to the left to circumvent the gate, then turned right and proceeded at an angle over the crossing. Miller thought that the Lee vehicle was trying to go around the gate and yelled at the driver to stop. The vehicle stalled on the tracks at a northwest angle and the driver's side was struck by the train. Miller testified that the train's speed was 30 to 40 miles per hour, although in a statement to Grand Trunk soon after the incident, he estimated the speed at 35 to 45 miles per hour. Miller further testified that the train's whistle was blowing the entire time, even until impact.

Pamela Young testified for plaintiff by means of an evidence deposition that she was proceeding west on 147th Street the evening of the occurrence. Traffic was heavy and there were three vehicles ahead of her in line at the crossing. The Lee vehicle drove slowly into the intersection at an angle because the surface was rough. After the auto was on the tracks, it stalled and then the gate came down and the lights started flashing. She did not hear the train's whistle or see its lights before the vehicle went on to the tracks. The second car in line backed up to avoid the gate, and hit the car immediately behind it. It then turned around and went in the opposite direction because there was not enough space before the crossing. The third car also backed up and struck Young's vehicle. After Young saw the collision, she went to the guardhouse and asked the employees to call the police. When the police arrived, she related to them what she had seen.

Gregory DeGroot, a paramedic, attended to the injured at the scene. He testified that Flennoy was intoxicated because he could smell alcohol on Flennoy's breath. Flennoy was uncooperative and pulled out an I.V. which had been taped on his arm. At his deposition, DeGroot testified that he smelled alcohol on Flennoy but could not determine whether Flennoy was intoxicated or if he was in a state of emotional shock from the accident. Flennoy had a head injury and did not talk to the paramedics.

Dr. Eugene Saltzberg, emergency room physician, treated Flennoy for 20 minutes, and sutured a facial laceration. Dr. Saltzberg testified that he thought Flennoy was intoxicated. He based this opinion on Flennoy's slurred speech, hostile attitude, and the smell of alcohol. Flennoy angrily requested that the doctor not ask him any more questions about the accident. Dr. Saltzberg conceded that it was understandable that Flennoy would not want to discuss an accident in which four young children were seriously injured. Dr. Saltzberg stated that Flennoy's slurred speech could possibly have resulted from the facial injuries he suffered, and that the trauma Flennoy experienced could affect his speech, manner and behavior. Dr. Saltzberg made no

entry in the hospital records that Flennoy smelled of alcohol, was hostile, had slurred speech or was inebriated.

Officer Roger Douglas of the Harvey police department interviewed Lee approximately one hour after the accident at the hospital emergency room. She told Douglas that the automobile went around the railroad gates. Douglas interviewed Flennoy, detected no odor of alcohol on Flennoy and concluded that he was not under the influence of alcohol. Lee denied having had a conversation with Douglas, and did not tell Douglas that her auto went around the gates. She also stated that Flennoy was not intoxicated.

Several Grand Trunk employees testified about the alleged speed tape and the functioning of the crossing devices. Joseph Waldecker, supervisor and road foreman, stated that 50% of the locomotives are equipped with speed tapes. The train's engineer does not know if the tape is recording his speed, and only the maintenance department can remove the tape. Waldecker stated that there was no speed tape on the train in question although it was equipped with a recorder. In his attempt to determine if a tape existed, Waldecker had not discovered an accident report filed by E.L. Camire, a Grand Trunk employee. The report stated: "speed tape removed at Elsdon roundhouse"; or another report stating: "crew interviewed at Elsdon, speed tape removed at Elsdon roundhouse." Waldecker also stated that the brakeman sitting to the left of the engineer in the engine cab has access to his own braking device which is located two or three steps from where he is sitting.

Edward Camire, Grand Trunk's relief assistant train master in charge of the Harvey area, stated that he was called from his office to investigate the accident. At trial Camire stated that he did not know if there was a speed tape on the train. However, shortly after the accident, Camire, prepared typed and handwritten documents reporting the details of the accident with information he personally obtained. In these documents, Camire wrote that a speed tape was removed at the Elsdon roundhouse. Camire testified that he made a "grammatical error" when he referred to "speed tape removed" and should have written "to be removed" because he did not know if it was physically there. Camire stated that if a speed tape existed it would have been removed by a roundhouse foreman at Elsdon and later sent to the home office in Michigan.

Alexander Newlands, Grand Trunk's supervisor of signals, explained that the gates, lights, flashers and bells at the 147th Street crossing are activated at 150th Street. When the train crosses the activation device or shunt, the bells and lights at 147th Street start im-

mediately; 2½ to three seconds later, the gates begin to descend. It takes 11 to 15 seconds for the gates to descend completely. The speed of the train is not related to the operation of the warning devices. If a train is traveling 35 miles per hour, the warning devices would be in operation for one minute. The shunt is approximately 3,300 feet from the 147th Street crossing, and a train traveling 35 miles per hour is moving at a rate of 51 feet per second. Therefore, at that speed, the train would be approximately 2500 feet or 50 seconds from the 147th Street crossing when the gates are completely down. There is no warning device that indicates if a vehicle is stalled on the tracks.

Antonio Castor, Grand Trunk's signal maintainer for the Blue Island area, described the crossing protection devices at 147th Street. There were two gates, one for each traffic direction, with four flashers, and three lamps per gate. He had inspected the equipment at the 147th Street crossing the day before the accident and again two hours after the accident. The equipment worked properly on each occasion, and he recorded the results of the inspections. Castor did not know the whereabouts of the maintenance records for the 147th Street crossing.

Walter Wagner, a railroad air brake consultant, testified as an expert witness for defendants. He calculated that the braking distance of the train traveling at 35 miles per hour was 1,303 to 1,430 feet, taking 42½ seconds. The total weight of the train was 2,747 tons. His opinion was based on data given him by Grand Trunk. He agreed that if the train were traveling faster than 35 miles per hour it would have required a greater distance to stop.

Defendants agreed that the four minor plaintiffs were free of contributory negligence which proximately caused the accident.

■■ Defendants initially contend that the trial court erred in not granting them judgments notwithstanding the verdicts. They also argue that there was insufficient evidence to support a finding of negligence. According to *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, judgments *n.o.v.* should be entered or verdicts directed only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." Where the evidence demonstrates a substantial factual dispute, or where the assessment of witnesses' credibility or resolution of conflicting evidence may determine the outcome, it is error to direct a verdict or enter judgment *n.o.v.* (*Wright v. Yellow Cab Co.* (1983), 116 Ill. App. 3d 242, 451 N.E.2d 1313.) Moreover, it is preeminently the jury's function to determine the issue of whether defend-

ants exercised reasonable care under the circumstances. (*Jardine v. Rubloff* (1978), 73 Ill. 2d 31, 382 N.E.2d 232.) If reasonable minds may differ as to the inferences and conclusions to be drawn from the facts, then judgment *n.o.v.* should not be entered. *Reuter v. Kocan* (1983), 113 Ill. App. 3d 903, 446 N.E.2d 882.

■ Viewing all the evidence in its aspect most favorable to plaintiffs, we find that the evidence presented a question for the jury whether defendants were negligent in their operation of the train. One or more of the following conclusions could have been drawn from the facts in evidence demonstrating a breach of defendants' duty to exercise reasonable care in the operation of the train: defendants operated the train at an excessive rate of speed under the conditions prevailing; defendants operated the train without a proper lookout; defendants failed to observe the automobile in sufficient time to stop the train; and defendants failed to place the train in emergency stop upon observing the automobile.

There was conflicting testimony with respect to the issue of speed. Grand Trunk's employees on the train testified that the speed was 30 to 35 miles per hour. Miller, the security guard, testified that the train traveled 30 to 40 miles per hour but he was impeached by his deposition testimony that the speed was 35 to 45 miles per hour. The issue of speed was further illustrated by the conflicting testimony regarding when the Lee vehicle moved onto the tracks and at what point the engine crew observed it. Young testified that the automobile went on the tracks before the gates descended. Therefore, viewing this evidence in the light most favorable to plaintiffs, the engine cab would have been at the 150th Street crossing and the vehicle would have been visible at that point. Although the engine crew stated that they first observed the vehicle at a distance much closer to 147th Street, their testimony cannot displace Young's credible testimony.

At a speed of 35 miles per hour, it would take over one minute to reach 147th Street from 150th Street and, allowing for reaction time, 45 seconds to stop the train. Since the auto was visible at 150th Street and the train could have stopped, it can be reasonably inferred that the train was traveling at an excessive speed. The train either reached the crossing in much less than one minute and, hence, could not have stopped within the time that the gates were activated at 150th Street and the train entered the 147th Street crossing, or the engine crew failed to observe the vehicle when it was visible at 150th Street, applied the emergency brakes too slowly, or maintained an excessive speed after observing the vehicle. In fact, Petch testified that Davis, instead of applying the emergency brake, continued to blow the

whistle after he observed the stalled vehicle. In view of Young's testimony and the inferences that could be drawn therefrom, there was sufficient evidence presented to send the issue of defendants' negligence based on excessive speed to the jury. See *Wright v. Yellow Cab Co.* (1983), 116 Ill. App. 3d 224, 451 N.E.2d 1313.

There was also sufficient evidence that defendants operated the train without a proper lookout or failed to observe the car in time to slacken the train's speed or stop it. Davis saw the auto drive onto the tracks after the gates were down and when the train was 450 to 600 feet from the crossing. Petch, on the other hand, did not see the auto drive onto the crossing. He first saw the vehicle on the crossing when the engine was 500 to 750 feet from the crossing. The testimony of Davis and Petch conflicts with that of Miller and Young. Young saw the vehicle move onto the tracks before the gates descended. Miller, however, saw the vehicle wait at the gate for 90 seconds before starting around the gate. He also saw the vehicle go around the gate when the train was 100 to 150 feet from the crossing.

In determining whether defendants failed to keep a proper lookout or failed to observe the vehicle in sufficient time to stop the train, an essential question is whether defendants failed to do that which a reasonably prudent person would do under the circumstances. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 457 N.E.2d 18.) There, the court held that knowledge of hazardous conditions should be imputed to defendants when the exercise of reasonable precaution and circumspection would reveal the danger of one's actions. Again, viewing the testimony in the light most favorable to plaintiffs, their vehicle went on the tracks and was visible at 150th Street before the gates descended. Since the train could have stopped in time to avoid a collision had Davis and Petch observed the auto at 150th Street or at any point before 1303 to 1430 feet from the crossing, it is reasonable to infer that they failed to keep a proper lookout or looked and failed to observe the vehicle near 150th Street in time to stop the train. It was for the jury to decide whether they failed to place the train in emergency stop upon observing the stalled vehicle. When Petch saw the vehicle, he told Davis that it was not moving. Davis responded that he was aware of it and continued to blow the whistle. Neither man activated the emergency brakes at that moment. After a few seconds, Davis applied the emergency brake, according to Petch. Davis said he did not know how long the vehicle was stalled before he put the train in emergency stop. Instead of immediately activating his emergency brake located a few steps away, Petch warned Davis and moved to the center of the engine cab to avoid the debris from the collision. Such

inaction and failure to institute emergency procedure immediately was evidence of negligence for the jury to consider. *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1970), 121 Ill. App. 2d 445, 257 N.E.2d 216, *aff'd* (1971), 49 Ill. 2d 118, 273 N.E.2d 809.

◼◼ After reviewing the evidence in its aspect most favorable to plaintiffs, we are not persuaded that it so overwhelmingly favors defendants that no contrary verdict based on that evidence could ever stand. The trial court properly denied defendants' motion for judgment *n.o.v.* Nor are the verdicts in favor of plaintiffs against the manifest weight of the evidence. It is the jury's function to weigh contradictory evidence, judge the credibility of the witnesses and draw the ultimate conclusion from the facts. (*Finley v. New York Central R.R. Co.* (1960), 19 Ill. 2d 428, 167 N.E.2d 212; *Cummings v. Chicago Transit Authority* (1980), 86 Ill. App. 3d 914, 408 N.E.2d 737.) It was the jury's prerogative to draw reasonable inferences and ultimate conclusions from the facts as to defendants' speed, observation, and emergency braking procedures. The verdicts will not be disturbed merely because the jury could have found differently or because judges might find other conclusions to be more reasonable. (*Jardine v. Rubloff* (1978), 73 Ill. 2d 31, 382 N.E.2d 232.) There was ample evidence to support the jury's finding in favor of plaintiffs. The trial court properly denied defendants' motion for a new trial.

◼◼ ◼ We reject defendants' contention that defendants' negligence was not proved by direct evidence or reasonable inferences from the circumstantial evidence. Plaintiffs proved by Young's direct testimony that their automobile drove onto the tracks before the gates descended. The reasonable inferences drawn from that fact fully support the jury's finding of negligence and effectively rebut the eyewitness testimony of Davis, Petch and Miller. Moreover, even circumstantial evidence of speeding and failure to observe can discredit and overcome direct evidence, including testimony of eyewitnesses. (*Kosch v. Monroe* (1982), 104 Ill. App. 3d 1085, 433 N.E.2d 1062.) We likewise reject defendants' argument that the negligence of Flennoy was the sole proximate cause of the accident. It is fundamental that there may be more than one proximate cause of an injury. (*Bentley v. Saunemin Township* (1980), 83 Ill. 2d 10, 413 N.E.2d 1242.) A party is liable for its negligent conduct whether it contributed in whole or in part to plaintiff's injury, so long as it was one of the proximate causes of injury. (*Millette v. Radosta* (1980), 84 Ill App. 3d 5, 404 N.E.2d 823.) Therefore, the fact that Flennoy may have partially caused the accident does not preclude a finding that defendants proximately caused the injuries to plaintiffs. Proximate cause is a question for the

jury to decide. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93.) In light of the conflicting testimony regarding whether Flennoy went around the gate or whether he was intoxicated and the ample evidence of defendants' negligence, we will not overturn the jury's determination that defendants proximately caused plaintiffs' injury.

Defendants next contend that the trial court erred in refusing to give defendants' instruction 11 (Illinois Pattern Jury Instruction (IPI) Civil No. 5.01 (2d ed. 1971)). That instruction regards plaintiffs' failure to call Flennoy as a witness, and instructed the jury that where a party fails to produce a witness within his power to produce, the jury may infer that the testimony of the witness would be adverse to that party.

The giving of this instruction rests within the sound discretion of the trial court, and a reviewing court will reverse only where a clear abuse of discretion has been shown. (*Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 460 N.E.2d 464.) Before giving the instruction, the court must first determine that a party would in all likelihood produce the witness under the facts and circumstances unless his testimony would be unfavorable. *Feigl v. Terminal R.R. Association* (1975), 30 Ill. App. 3d 55, 332 N.E.2d 416.

The trial court properly refused defendants' tendered instruction. The court found that plaintiffs had a reasonable excuse for not producing Flennoy as a witness. He had been convicted of armed robbery and plaintiffs did not want to subject Flennoy to possible impeachment by means of a prior felony conviction. (See *Knowles v. Panopoulos* (1977), 66 Ill. 2d 585, 363 N.E.2d 805; *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) That defendants intended to impeach Flennoy by use of his prior conviction is evidenced by the fact that they did not choose to call him during their case in chief and that they had prepared a jury instruction on the subject. We find no abuse of the trial court's discretion in refusing to give the tendered instruction. Where a reasonable excuse existed for not calling Flennoy as a witness, the failure to call him did not give rise to a negative inference. Further, a reasonably prudent person would not have produced him under the circumstances. (See *Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 462 N.E.2d 645.) We are not persuaded by defendants' argument that plaintiffs should have called Flennoy and tested the admissibility of the prior conviction for impeachment purposes through a motion *in limine*. The possibility of impeachment is a sufficiently reasonably excuse precluding the negative inference instruction.

■ Defendants next contend that the trial court erred in giving plaintiffs' instruction number 15 (IPI Civil 2d No. 15.01) relating to causation. The "long term" proximate cause instruction states:

"When I use the expression 'proximate cause', I mean that cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

"This instruction in its entirety [including the last two sentences] should be used only when there is evidence of a concurring or contributing cause to the injury *** (other than acts or omissions of the plaintiff)." IPI Civil 2d No. 15.01, Notes on Use, at 93.

Defendants argue that this instruction allowed the jury to consider Flennoy's conduct as only a contributing cause and invited the jury to find defendants also negligent. Since defendants claim that Flennoy's conduct was the sole proximate cause of plaintiffs' injuries, they argue there was no evidence to support the instruction regarding other causes and giving it was error.

We find that there was sufficient evidence before the jury of concurring, proximate causes of plaintiffs' injuries. We have previously reviewed the evidence relating to the conduct of those involved in the collision: Davis, Petch, Flennoy and plaintiff Lee. Flennoy's conduct could have been the sole proximate cause of the occurrence and the jury was so instructed. However, Flennoy's conduct could also have been a contributing cause. Where the evidence shows that a third party may have contributed to cause plaintiff's injuries, it is not error for the court to give the entire instruction. (*Ruggiero v. Public Taxi Service, Inc.* (1973), 16 Ill. App. 3d 754, 306 N.E.2d 567.) Nor did giving this instruction confuse the jury on the issue of proximate cause in view of the other instructions.

■ Defendants next contend that the trial court erred in refusing to submit their special interrogatories to the jury. Defendants tendered the following four interrogatories:

(1) Did the defendants operate the train at an excessive rate of speed under the conditions prevailing at the time of the occurrence?

(2) Did the defendants have sufficient time to observe plaintiffs' automobile stalled upon the tracks in order to stop the train and avoid the collision?

(3) Were the crossing gates in a down position prior to the occurrence?

(4) Did the plaintiffs' vehicle go around the crossing gates while they were in a down position prior to the occurrence?

A special interrogatory is not in proper form unless it relates to an ultimate fact in the case and unless an answer responsive to it would be inconsistent with some general verdict that might be returned. (*Gasbarra v. St. James Hospital* (1979), 85 Ill. App. 3d 32, 406 N.E.2d 544.) A special interrogatory which asks for a finding as to a mere evidentiary fact is always improper. (*Ellerman v. Clark Products, Inc.* (1978), 67 Ill. App. 3d 848, 384 N.E.2d 940.) When the form of the special interrogatory is improper, the trial court has discretion in submitting it to the jury. *Stach v. Sears, Roebuck & Co.* (1981), 102 Ill. App. 3d 397, 429 N.E.2d 1242.

We find that defendants' special interrogatories were not in proper form because they did not relate to an ultimate issue of fact. The ultimate issue of fact here is whether defendants' negligence proximately caused plaintiffs' injuries. Plaintiffs alleged four separate theories of negligence: excessive speed, improper lookout, failure to observe in time to slacken speed, and failure to promptly apply the emergency brakes. Defendants' first two special interrogatories, however, address separate and specific acts of misconduct by defendants without reference to proximate cause. (*Eichorn v. Olson* (1975), 32 Ill. App. 3d 587, 335 N.E.2d 774.) The last two special interrogatories relate to the position of the crossing gates but do not address the ultimate question of whether a third party's negligence contributed to cause plaintiffs' injuries. The tendered interrogatories merely asked for findings on evidentiary facts and were properly refused by the trial court. (*Ellerman v. Clark Products, Inc.* (1978), 67 Ill. App. 3d 848, 384 N.E.2d 940; see *Le Flore v. Chicago Transit Authority* (1973), 12 Ill. App. 3d 71, 297 N.E.2d 758.) Furthermore, findings requested by the special interrogatories would not control the general verdict. Even if all the interrogatories were answered favorably to either party, the answers would not necessarily be inconsistent with a general verdict in favor of the other party. Where plaintiffs alleged four separate theories of negligence, the inclusion of only two allegations of defendants' misconduct in the special interrogatories rendered them improper. See *Stach v. Sears, Roebuck & Co.* (1981), 102 Ill. App. 3d 397, 429 N.E. 2d 1242; *Gassbarra v. St. James Hospital* (1979), 85 Ill. App. 3d 32, 406 N.E.2d 504.

Defendants also contend that the trial court erred in denying their motion *in limine* precluding reference to the speed tape or crossing-protection maintenance records. At the instructions conference, defendants presented a motion to prevent plaintiffs from refer-

ring to the existence or nonproduction of the speed tape in closing argument. The trial court denied the motion, stating that it was for the jury to decide whether the tape existed. The court did grant defendants' motion *in limine* precluding plaintiffs' exploration of any malfunction of the crossing protection devices after plaintiffs rested.

The motion *in limine* precluding plaintiffs' exploration of any prior malfunction of the crossing protection devices did not extend to the maintenance records. Consequently, the alleged prejudicial testimony and comment did not violate the parameters of the *in limine* order. (*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 416 N.E.2d 268.) Moreover, there was no prejudice to defendants because they themselves raised the issue of crossing inspection reports during Castor's direct examination and plaintiffs properly conducted cross-examination within the scope of the direct. (*Vinke v. Artim Transportation System* (1980), 87 Ill. App. 3d 400, 408 N.E.2d 1112.) Finally, the comment by plaintiffs' attorney during closing argument was a reasonable inference from the evidence. See *Tonarelli v. Gibbons* (1984),121 Ill. App. 3d 1042, 460 N.E.2d 464.

██ With respect to the comment upon defendants' failure to produce the speed tape, the trial court did not abuse its discretion in denying defendants' motion *in limine* and allowing plaintiffs' attorney to argue that the speed tape existed and should have been produced by defendants. That the speed tape existed was a fair comment about the admission contained in defendants' records that a speed tape was removed at the Elsdon roundhouse. It was for the jury to decide whether to believe Camire that the reports contained a grammatical error or whether in fact a tape was removed. Since plaintiffs' attorney commented on relevant admissible evidence, it was permissible. (*Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309.) Any adverse inference resulting from defendants' failure to produce the speed tape was also proper comment by plaintiffs' counsel. *Dollison v. Chicago, Rock Island & Pacific R.R. Co.* (1976), 42 Ill. App. 3d 267, 355 N.E.2d 588.

██ Defendants next contend that the trial court erred in failing to permit expert testimony as to whether the train could have stopped in time to avoid a collision. Defendants' expert witness Wagner, a railroad air-brake consultant, testified as to the train's emergency stopping distance and stopping time. The trial court ruled that Wagner could not testify as to whether the train could have stopped in time to avoid this accident because it would not have added to the jury's understanding of the issue. Defendants maintain that the expert testimony would have assisted the jury by presenting information

beyond the ken of the average juror. Defendants also argue that Wagner would not have reconstructed the accident but would have offered an opinion based on the facts in evidence.

Generally reconstruction evidence may not be used as a substitute for eyewitness testimony. (*Plank v. Holman* (1970), 46 Ill. 2d 465, 264 N.E.2d 12.) However, where it is necessary for the jury to rely on knowledge and application of principles of science beyond the ken of an average juror, reconstruction testimony may be used in addition to eyewitness testimony. (*Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 392 N.E.2d 1.) Likewise, expert opinion testimony is permissible to assist the jury when the subject matter is such that only persons of skill or experience are capable of forming a correct judgment. *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809.

■■ In the present case, several eyewitnesses testified as to the speed of the train, where the train actually stopped after impact, when the crossing gates descended, and the position of the Lee vehicle relative to the gates. A nonoccurrence witness, Newlands, testified for defendants about the timing of the crossing gates and specifically stated the distance and time between the triggering mechanism and the gates. Whether Wagner's proffered testimony is considered to be reconstructive or expert opinion, it was properly excluded because it did not involve subject matter beyond the ken of the average juror. Given the testimony adduced at trial, including Wagner's own testimony as to the emergency stopping district and stopping time, only a simple arithmetic calculation was required. The jury could readily compute whether the train could stop in time depending on when they determined the vehicle to be visible on the tracks and their determination of the speed of the train. It was unnecessary for defendants to attempt to bolster the eyewitness opinion testimony of Petch that the train could not have stopped in time. The trial court did not abuse its discretion, therefore, in not allowing Wagner's testimony as to whether the train could have stopped in time to avoid a collision where there was sufficient eyewitnesses and scientific testimony available to assist the jury. See *Trillet v. Bachman* (1981), 96 Ill. App. 3d 477, 421 N.E.2d 580.

■■ Defendants also contend that the trial court improperly excluded an excited utterance made by Alvin Miller to Billy Farrer shortly before the collision. Farrer allegedly heard Miller say that the automobile was going around the gates. The trial court sustained an objection to the questioning of Farrer on cross-examination and ruled that defense counsel's inquiry into the conversation improperly went

beyond the scope of direct examination. Defendants claim that the statement should have been admitted as an "excited utterance" exception to the hearsay rule. They further assert that the exclusion improperly restricted their right to relevant cross-examination.

The scope and extent of cross-examination is generally within the sound discretion of the trial court and unless that discretion is clearly abused, with resulting prejudice to a party, we will not overturn such a ruling on appeal. (*Dickeson v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1966), 73 Ill. App. 2d 5, 220 N.E.2d 43, *aff'd* (1969), 42 Ill. 2d 103, 245 N.E.2d 762.) The scope of cross-examination is limited to matters covered on the direct examination. (*Telpner v. Hogan* (1974), 17 Ill. App. 3d 152, 308 N.E.2d 7.) Where the cross-examiner attempts to go beyond the scope of the direct examination in an effort to present his theory of the case, it is not error for the trial court to sustain an objection to that inquiry. *Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 200 N.E.2d 149, *aff'd* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204.

■■ The trial court properly excluded the hearsay testimony because it went beyond the scope of the direct examination and because there was no resulting prejudice to defendants. The direct examination of Farrer was limited to how he became aware of the accident (from Miller's statement) and his observation of events thereafter. The fact of the conversation, not the content, was relevant. Defendants' inquiry into Miller's statement itself during Farrer's cross-examination impermissibly exceeded the scope of cross-examination. There was no prejudice to defendants because Miller himself testified as to his statement to Farrer during defendants' presentation of their case, on direct, cross and redirect examination. Accordingly, the trial court did not abuse its discretion in limiting defendants' cross-examination of Farrer. See *Sweeney v. Max A.R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.

Defendants contend further that the trial court improperly allowed plaintiff's counsel to cross-examine Davis. In questioning Davis, plaintiffs' counsel referred to the area near 147th Street as "congested with crossings." Defendants' objection to the question was overruled. Defendants claim that this characterization was improper and an attempt to suggest excessive speed under the circumstances where there had been no evidence introduced to establish an appropriate speed. As we have noted, the scope of cross-examination rests largely within the sound discretion of the trial court and unless there is an abuse of discretion and prejudice results, the ruling of the trial

court will not be overturned on appeal. *Sweeney v. Max A.R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.

▮▮ We find that the trial court properly overruled defendants' objection to the questioning of Davis and that the characterization of the area near 147th as "congested" was not improper. Davis had been called as an adverse witness, and first testified that there were "so many crossings" in the area; seven crossings from 155th to 147th Street, a distance of about 1½ to 1¾ miles. He later stated that the distance was a little over one mile. Plaintiffs were establishing the setting of the accident through defendants' witnesses. In view of Davis' description of the area, plaintiffs' counsel's characterization of the area was accurate. It was proper for plaintiffs to use the description of the area to establish excessive speed under the circumstances. One of the theories set forth to show defendants' lack of due care was excessive speed and there was ample evidence to support that negligence theory. The trial court did not abuse its discretion, therefore, in permitting plaintiffs' counsel to question Davis about the area "congested with crossings" where that questioning dealt directly with an issue at trial. (See *Piechalak v. Liberty Trucking Co.* (1965), 58 Ill. App. 2d 289, 208 N.E.2d 379.) In any event, in construing the record as a whole and the lenghty trial, the single remark by plaintiffs' counsel was not prejudicial. See *Clamage v. Shapiro* (1977), 48 Ill. App. 3d 90, 365 N.E.2d 471.

▮▮ Defendants finally contend that the trial court improperly allowed plaintiffs' counsel to comment upon the failure of Flennoy to testify at trial. During closing argument, plaintiffs' counsel remarked that neither plaintiffs nor defendants had called Flennoy as a witness. Defendants did not object to these remarks. During his closing argument, defense counsel also referred to Flennoy's absence. Plaintiffs had previously agreed that defendants could comment on Flennoy's absence. Defendants maintain that it was prejudicial error for the trial court to deny them the benefit of the jury instruction on plaintiffs' failure to call a particular witness, and then permit plaintiffs to explain Flennoy's absence in closing argument.

During closing argument, counsel is permitted broad latitude to draw reasonable inferences and conclusions from the evidence. (*Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 460 N.E.2d 464.) The scope of closing argument is within the sound discretion of the trial court, and an argument must be prejudicial for a reviewing court to reverse on these grounds. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188.) Where defendants raised no objection to alleged errors during plaintiffs' closing argu-

ment, any error is waived on appeal. *Jamison v. Lambke* (1974), 21 Ill. App. 3d 629, 316 N.E.2d 93.

Even if defendants have not waived this issue, the comments by plaintiffs' counsel were not prejudicial. The comments were made in anticipation of defendants' argument attempting to shift the jury's focus to Flennoy's negligence rather than that of defendants'. Defense counsel did comment at length in closing argument about Flennoy's absence and alleged intoxication. Defendants cannot complain about comments to the jury by plaintiffs' counsel when defense counsel indulges in similar remarks during his own closing argument. (*Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 388 N.E.2d 770.) There was no prejudice to defendants as a result of plaintiffs' argument where the trial court properly denied an instruction on plaintiffs' failure to call Flennoy as a witness, but allowed both parties wide latitude in arguing the inferences to be drawn from Flennoy's absence. See *Brandel v. Yellow Cab Co.* (1981), 98 Ill. App. 3d 88, 423 N.E.2d 1237.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGILLICUDDY and WHITE, JJ., concur.